**Eddie SMITH, Plaintiff,**

v.

**FLOWERS TRANSPORTATION, INC., Defendant.**

**No. GC 72–136.**

United States District Court,
N. D. Mississippi,
Greenville Division.

June 5, 1974.

Orma R. Smith, Jr., Corinth, Miss., for plaintiff.

J. A. Lake, Greenville, Miss., William C. Cramer, Miami, Fla., for defendant.

# 1114

## MEMORANDUM OPINION

KEADY, Chief Judge.

Eddie Smith, plaintiff, brings this admiralty action against Flowers Transportation, Inc., defendant, seeking damages for serious personal injuries sustained in the course of his employment. by defendant as a deckhand aboard the M/V LADY REE. The accident occurred on December 10, 1970, at 11:30 p. m. on the Tennessee River, when a portion of the vessel's tow was being locked downstream through the Gilbertsville Dam at Gilbertsville, Kentucky. The plaintiff asserts liability because of unseaworthiness of the vessel and its gear, Jones Act negligence on the part of the defendant, and also for maintenance and cure in excess of the paid portion. Defendant denies that it was negligent or that the vessel and its tow were unseaworthy and affirmatively claims that the negligence of the plaintiff was either the sole or a contributing proximate cause of the accident. After a nonjury trial and consideration of memorandum briefs, the court now determines the merits of the action, incorporating herein its findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ. P.

Plaintiff raises several claims of unseaworthiness and negligence as follows: (1) Defendant provided a towing line which was defective since it was either worn, too short, of inadequate size and tensile strength for a lock line, or, being of polyethylene material, possessed characteristics upon breaking that made it a dangerous rope; (2) defendant's failure to provide plaintiff with a reasonably safe place to work by sending an excessive number of barges through the lock at one time; and (3) defendant's failure to apprise the plaintiff of the special dangers and procedures for safely checking barges through the Gilbertsville lock during night hours. Defendant's challenge to these contentions raises issues which are primarily of a factual nature.

Many basic facts are undisputed. Plaintiff, 22 years old and a resident of Counce, Tennessee, had for the previous 15 months worked as deckhand and relief mate for towing companies other than the defendant on the Ohio and Upper and Lower Mississippi Rivers. He had, however, no prior experience on the Tennessee River or locking through any of its dams. Tommy Pickens, Captain of the LADY REE, telephoned plaintiff at his home on the night of December 9, to advise that there was an immediate opening for the position of deckhand, and possibly later as mate, and requested plaintiff to board the vessel that same night at River Heights, Tennessee. Plaintiff did so, arriving at the boat at 11:30 p. m. Plaintiff advised the captain that he understood the job. He was given no instructions or supervision of any kind, and stood the forward watch as the vessel and its tow proceeded downstream to the Gilbertsville Dam, which it reached the following night at 10:45.

Upon its approach to the lock, the LADY REE's tow consisted of 11 empty grain barges made up 3 abreast and 4 long, with the two stern barges and the towboat on the port side, aft. Because of the size of the flotilla, it was necessary to double-trip through the lock, and a forward cut of 9 barges was first placed in the lock chamber, while the LADY REE and the two stern barges pulled back to await later passage. The lock chamber, which was 110 feet wide and 600 feet long, was practically filled by the forward cut which measured 105 feet in width and 585 feet in length (the grain barges were each 35′ x 195′). Two crew members, plaintiff and Carlos Swain, the mate, remained on the cut of barges. Plaintiff and the mate first secured the barges to floating timber heads attached to the lock wall, and the water level within the chamber was reduced to the downstream pool stage. At this point, the water level was approximately 35 feet below that portion of the long lock wall which extended downriver 400 feet on the port side. Pullout lines were then handed out from the lock crew to an electric mule," a device which op-

erated upon a track at the top of the port wall, to pull the string of barges through and beyond the opened downstream lock gate. The mule moved the barges for several hundred feet at "middle speed," or less than one mile an hour, until the barges floated outward. During this entire maneuver plaintiff was stationed alone at or near the quarter kevel on the port stern barge, about 50 feet forward of the stern, and handled the pullout line when it was released by the mule. Meanwhile, Swain was at the head of the tow, about to handle a line to keep the lead barge close to the lock wall and prevent the tow's "topping out" into the river. Another deckhand was positioned upon the lock wall near the head of the tow to assist Swain in handling the lock line.

Swain, a veteran seaman in locking through Tennessee River dams, was at this point rendering off a 2″ polyethylene or plastic lock line, the eye of which he had hooked over a nearby peg in the port lock wall, thus guiding the head of the tow. Simultaneously, plaintiff, at the stern, was handling a 1¾″ plastic line, the eye of which he had placed on a peg in the first row of pegs past the downriver gate, and he was feeding off on this line as the sternmost of the cut passed by the first row of pegs. Plaintiff then proceeded to check or reduce the speed of the barges by placing several figure eight patterns on the port quarter kevel and gradually rendered off the line. Noting the speed of the barges, plaintiff continued to apply pressure on the line, throwing a fourth figure eight over the kevel and sitting back on the line. When he jerked the line for slack, it fouled or kinked on the kevel, making taut the line to the lock wall peg. This action brought the barges to a sudden halt, slamming the stern against the lock wall. The stern line parted with a loud, popping noise and snapped back as plaintiff unsuccessfully tried to elude its whipping movement. The broken end of the line attached to the quarter kevel struck plaintiff in both legs and hurled him into the water behind the cut, where he remained 30 minutes or more until rescue efforts could be effectively employed. After the accident, the eye end of the line, approximately 70 feet long, was found hooked to the first row of pegs in the lock wall; the other portion of the line, with four figure eights wrapped on the stern kevel, had nearly 50 feet of free line on the deck of the barge.

When plaintiff began to apply greater pressure by making the fourth and last turn and sitting back on the line, the buzzer horn for the all-clear signal had not been sounded by the lock operator, and the lower lock gate had not entirely closed. Plaintiff and Swain, at their respective locations, were not within sight of each other, and had no method of communicating the timing of their movement. Swain, still checking the large barge against the port lock wall, had not commenced to restrain the forward speed of the barges, and was awaiting the all-clear signal. Thus, when the stern barges slammed against the lock wall, Swain's line at once became slack, and he tied off the barges before going to the stern to see what had happened. With respect to his own line, Swain on cross-examination testified:

"A I don't stop the barges until they blow a buzzer horn, let me know it's all clear. Then I help them stop the barges.

Q That's right. And they had not blown the buzzer, or the horn, in that case?

A No, sir.

Q And you had not done anything to try to stop the forward motion of the barges, but only to keep it over against the wall?

A No, sir. In other words, I didn't know if it was ready to be stopped or not, because no one had give me the all-clear sign.

Q All right, sir.

So, then, the entire weight, the entire pressure, or force, of these barges

moving out of the locks and downriver was on the stern line that Eddie was using to check them down?

A At the time that he broke his line?

Q Yes, sir.

A I could have been in the process of moving my line. In other words, I didn't know what he was doing back there or anything. I had my line on the peg when it broke.

\*  \*  \*  \*  \*  \*

Q And you were trying to keep the head of the barges against the wall?

A I had my line on there keeping the head checked in and slowing them down. I knew it was getting close. In other words, as you check them in, you know you automatically are slowing them down."

■ Thus, the plaintiff, alone, was attempting to stop the barges and his stopping maneuver was made prematurely and without coordinated effort with the mate at the head of the tow.

It is equally certain from the evidence that, to an experienced seaman, the rendering off or feeding line in checking the speed of a cut of barges is largely a matter of judgment, and dependent on various factors. It is well known, however, that the more figure eight patterns made on a kevel, the greater is the likelihood of the line becoming fouled, taut and breaking.

■■ Contrary to plaintiff's contentions, the polyethylene line in issue did not part because it was defective, nor was it too short for the purpose intended. According to the weight of the evidence, the plastic line was 1¾" in diameter and at least 120′ in length; and it was of the type generally and customarily used as a lock line by maritime operators in the Tennessee River. It is unnecessary to resolve the conflict between Captain Pickens' trial testimony and his deposition as to whether a 2″ line should have been used. The proof by independent operators in the Tennessee River which clearly established that a 1¾" polyethylene line may be safely, and is

ordinarily, used for both stern and head lock lines, is persuasive on this question. There is no credible evidence that plaintiff's line parted because it was worn or not fit for use; on the contrary, the line was in good condition and suitable for normal usage. We are also convinced that the tensile strength of plastic lines is greater than that of manila, or grass, lines, and that plastic lines pose no particular hazard when properly used by seamen. Nor can we accept plaintiff's argument that making up a cut of nine barges for passage through the Gilbertsville Lock resulted in an unseaworthy condition, for the lock chamber was quite capable of carrying that number of barges and it was standard practice for towers to place up to nine barges in the first cut where the size of the flotilla necessitated double tripping.

■ Although an absolute duty is upon the shipowner to furnish a seaworthy vessel and appurtenances, the standard for determining seaworthiness is "not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." Mitchell v. Trawler Racer, 362 U. S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941, 950 (1960). When the LADY REE, its tow, lines and other gear are measured by this standard, we conclude that they were reasonably fit for locking through Gilbertsville Dam and that the condition of neither the flotilla nor its gear contributed to the injuries sustained by the plaintiff.

■ Nevertheless, we are of the view that the evidence clearly supports a finding of operational negligence against the shipowner due to defendant's total failure to apprise plaintiff of hazards incident to moving barges through the Gilbertsville Lock under the circumstances here presented. Special precautions were reasonably needed to afford safe passage downriver for the first cut of barges. The defendant chose to make the locking maneuver at night and by

placing in the lock chamber the maximum number of barges on a single trip. Although quite permissible, this procedure posed unique operational problems. It was foreseeable, for example, that with the considerable distance of the down fall to pool stage, the deck crew on such a cut would not be in contact or communication with each other, and they would be working in darkness, well away from the illumination provided by the lock wall lights, and handling lines on barges being pulled at a definite speed beyond the lock gate.

Given such working conditions, reasonably prudent operators, aware of the number of barges being checked by only two seamen, one stationed at the port bow and the other at the port stern, would anticipate that an advance understanding of some sort was needed for the two employees to coordinate their efforts to secure the barges. This understanding could be easily achieved if the deck crew knew that they were to await a signal or that they were to direct their efforts to secure the barges in relation to a particular row of pegs in the lock wall.[1] Checking and stopping nine barges was hardly a task which a single deckhand at the stern could be expected to accomplish safely, regardless of the size, length or strength of his line. Yet, that was precisely what the plaintiff was attempting to do without different advice from Captain Pickens, Swain or anyone else. Defendant could easily have warned plaintiff to wait for the signal from the lock operators before applying pressure on his line, and alerted him as to the location of successive rows of pegs available for checking the barges. Because of these omissions, plaintiff was engaged in the unsafe act of "sitting back" on his line without any real assistance from Swain at the head of the tow, and overstressing the line with the entire tow.

The owner of a vessel has a clear duty to supervise the work of a seaman under his command. In addition, he must warn the seaman of all impending dangers of which he, the shipowner, is or should be aware, and the shipowner is chargeable with the knowledge, or lack of knowledge, of his employees. Olsen v. States Line, 378 F.2d 217 (9 Cir. 1967); Olah v. S. S. Jaladurga, 343 F.2d 457 (4 Cir. 1965); Stevens v. Seacoast Co., Inc., 414 F.2d 1032 (5 Cir. 1969). Liability under the Jones Act, 46 U.S.C. § 688, results whenever "the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury . . . for which damages are sought." Rogers v. Missouri Pacific Ry. Co., 352 U.S. 500, 506, 77 S.Ct. 443, 448, 1 L.Ed.2d 493 (1957); Vickers v. Tumey, 290 F.2d 426 (5 Cir. 1961). The duty to supervise is not limited merely to the green, inexperienced seaman but extends to those jobs which require concerted efforts of crew members; and the duty to warn, of course, applies to all cases where employees are ignorant of the peril. In the case sub judice, this duty on the shipowner was not assumed at all by Captain Pickens, nor was it discharged by Swain's simply offering plaintiff a choice of checking the barges either at the head or at the stern, without making certain that plaintiff did understand the locking procedure at Gilbertsville Dam. Plaintiff had just come aboard the vessel within the past 24 hours, and, despite his experience as a deckhand on other rivers, was totally unfamiliar with locking a cut of barges through the Gilbertsville Dam. Under these circumstances, it is no complete defense that the line would not have broken except for the careless manner in which plaintiff allowed it to become fouled, for, despite the plaintiff's negligence, defendant owed him due care to make working conditions reasonably safe. For the reasons stated, we hold there was a breach of this duty.

Upon a finding that both plaintiff and defendant were guilty of negligence

---

1. Several rows of pegs, 68 feet apart, were mounted on the downriver side of the lock wall.

which proximately contributed to the accident and the resulting injuries, we hold that the negligence of each contributed in equal degree to the plaintiff's injuries and damages, thus requiring that his recovery be reduced by one-half of total damages shown by the evidence.

Plaintiff sustained severe and extensive lacerations of his right leg and a lesser injury to his left ankle. No fractures or dislocations were suffered. After undergoing surgery for soft tissue damage, plaintiff was hospitalized, first at Paducah, Kentucky, and later at Corinth, Mississippi, for 46 days. Upon his discharge, his leg was still in a cast, and he was for several months totally incapacitated. Plaintiff obtained maximum medical recovery from his injuries nine months after the accident, or about September 10, 1971, at which time he returned to his regular work on the river. His injuries have resulted in permanent partial disability, primarily to the right leg, but also, to a lesser extent, to the left ankle. His right leg has sustained the loss of about one-fourth of the muscle power which raises the right foot up and turns it out, resulting in a weakened, unstable ankle. Although there is normal range of motion in the right leg, the power of motion, as in running, jumping and climbing, is adversely affected. To a slighter extent, the left ankle, with less scarring, is also weakened. The medical experts differ somewhat in their evaluation as to the extent of anatomical impairment. Two treating orthopedic specialists gave plaintiff a disability rating of 15% in the right leg and 10% in the left, while an independent specialist rated his disability at 7% to the right leg and 2½% to the left. Considering the evidence as a whole and resolving the conflicts, the court determines that plaintiff's physical impairment amounts to 10% to the right leg and 5% to the left. Throughout the period of convalescence and even now on occasions of prolonged walking, standing or sudden movement, plaintiff has suffered and continues to suffer substantial pain, for which he finds it necessary to take pain-killing medication.

At the time of the accident, plaintiff's wages were $17.50 per day plus food. Except for a seven-day period when he tried to perform only light duty for defendant, plaintiff was physically unable to resume his employment until September 10, 1971. Since that time, however, he has been regularly employed by other towing companies as mate and as tankerman, and at wages greater than he received prior to the accident. Plaintiff is presently earning $32 per day as tankerman for Marine Transportation Company and has presented no evidence that his partial disability will preclude his continued employment. Even though plaintiff's wages to date have not diminished but have in fact escalated, it is reasonably certain that his physical limitations do hamper his wage-earning capacity, and his disability does produce unusual stresses in his performance of strenuous and active work as a crew member on vessels plying the inland waterways. These stresses are reasonably certain to cause plaintiff not only physical discomfort but also certain economic detriment in his future work experience. Considering the compensable elements of past, present and future pain and suffering, the nature and extent of the physical disability, and economic loss accrued and likely to continue to accrue, as shown by the weight of the evidence, we conclude that plaintiff's whole damages have a reasonable and proper value of $35,000. Since that sum should be reduced by 50% on account of his comparative negligence, plaintiff is entitled to recover allowable damages of $17,500.

The court also holds that certain sums are due by way of maintenance and cure, over and above total payments of $4,318.73 heretofore made by defendant. Since the medical evidence clearly establishes that plaintiff did not obtain maximum medical recovery prior to September 10, 1971, the date on which plaintiff returned to his regular river work, plaintiff is entitled

to maintenance from the time of his injury until that date, excluding 46 days he was in hospitals and 7 days he worked for defendant in May 1971. Defendant has heretofore paid plaintiff $1,293 over and above cure items of $3,025.73. After deducting one month's wages of $525, allowed as wages to the end of the voyage, defendant has a credit of $768 for paid maintenance. Plaintiff being entitled to a net of 221 days' maintenance at $8 per day or $1,768, he is due to receive the additional sum of $1,000. In addition, plaintiff is entitled to be paid $599.05 for unpaid items of cure, as stipulated by the parties. Thus, plaintiff is entitled to recover $1,599.05 as unpaid maintenance and cure.

Let an order be entered for plaintiff accordingly.