**Michael J. BACZOR**

v.

**ATLANTIC RICHFIELD COMPANY.**

Civ. A. No. 75–1599.

United States District Court,
E. D. Pennsylvania.

Dec. 29, 1976.

**1372**

Allan M. Dabrow, Philadelphia, Pa., for plaintiff.

William E. Rapp, Philadelphia, Pa., for defendant.

SUR PLEADINGS AND PROOF

LUONGO, District Judge.

This matter was tried to the court on September 15–17, 1976. On the pleadings and proof, I make the following

## FINDINGS OF FACT

1. Plaintiff Michael J. Baczor is a resident of Bridgeton, New Jersey.

2. Defendant Atlantic Richfield Company (ARCO) is a corporation having its principal place of business in Philadelphia, Pennsylvania.

3. During 1970, 1971, and 1972, defendant owned and operated certain vessels, including a tugboat known as Atlantic Tug No. 5, on the navigable waters of the United States.

4. During 1970, 1971, and 1972, plaintiff was employed by ARCO as a cook/deckhand aboard Atlantic Tug No. 5. His duties included handling tow lines.

5. At all times material to this action, Atlantic Tug No. 5 was equipped with several tow lines which were stowed in coils atop a grated wooden platform. The platform was raised about four inches above the tug's deck, and the tow lines were coiled to a height of approximately eighteen inches, as measured from the bottom of the platform. One half of a canvas tarpaulin was placed between the platform and the coiled lines; the other half was folded back over the top of the lines to protect them from the natural elements. A shackle and hook, each weighing approximately four to six pounds, were placed atop the upper portion of the canvas to prevent it from blowing off. The shackle and hook were not tied down or secured in any way and were kept in place solely by virtue of their weight.

6. There were alternate methods of protecting the lines, including use of canvases with grommets at their ends, with which the canvases could be tied down with rope. Alternatively, the shackle and hook used to weigh down the canvas could be tied down and secured in place. Such methods were not used aboard Atlantic Tug No. 5.

7. Plaintiff presented evidence that on an evening in November 1970—plaintiff has failed to establish the exact date—plaintiff was on duty aboard Atlantic Tug No. 5. As the tug was pulling away from its dock in the Schuylkill River, plaintiff attempted to remove the canvas tarpaulin covering the tow lines to prepare the lines for use. As he did so, an unsecured shackle atop the tarpaulin slid off and struck his feet.

8. Plaintiff did not report the incident to the tugboat's master, Nasa Williams.

9. Plaintiff presented evidence that as a result of this incident, he did not report for work on November 16, 1970.

10. Plaintiff presented evidence that, while he was absent from the job, he called ARCO's Fort Mifflin dispatch office and informed the dispatcher of his absence due to disability.

11. One of ARCO's dispatchers, George B. Barbarick, testified that he remembers being told that plaintiff had sustained injury from the dropping of a shackle, but cannot recall exactly when he was told, noting that it may have been as early as 1968.

12. Plaintiff visited Dr. Stanley Bernstein on November 10 and 20, 1970, for treatment of his foot. Although it was Dr. Bernstein's normal practice to take a history from his patients to enable him to determine etiology and to make a diagnosis, Dr. Bernstein's notes contain no mention of a history of traumatic injury to plaintiff's foot.

13. Plaintiff reported to ARCO's dispensary on November 23, 1970, in anticipation of returning to work on the following day. For that visit, the following entry was made in ARCO's medical record pertaining to plaintiff:

"Man was treated for infection & cellulitis rt. 4th toe—says he struck it & then became infected—Treated by Dr. Bernstein."

The injury was classified as "non-industrial." (Exhibit P–1)

14. Plaintiff returned to work on November 24, 1970.

15. Plaintiff presented evidence that at some time during December 1970 or January 1971—plaintiff has failed to establish the date precisely—plaintiff was again preparing to ready the tow lines on Atlantic Tug No. 5. As he did so, an unsecured shackle atop the tarpaulin slid off and landed on his right foot.

16. Plaintiff did not report this incident to the tug's master.

17. Plaintiff suffers from diabetes mellitus.

18. Plaintiff presented evidence that as a result of either the incident of November 1970 or that of December 1970 or January 1971, or of both, he sustained injuries to his right foot which did not easily heal because of his diabetic condition.

19. Plaintiff presented evidence that as a result of his injuries he was absent from work commencing on January 8, 1971.

20. Plaintiff presented evidence that while he was absent from work in 1971, he telephoned ARCO's Fort Mifflin dispatch office from time to time and informed the dispatcher of his absence due to disability.

21. On January 19, 1971, plaintiff visited Dr. Bernstein for treatment of his foot. Dr. Bernstein diagnosed the problem as osteomyelitis. He immediately admitted plaintiff to Bridgeton Hospital, Bridgeton, New Jersey, where a further diagnosis of diabetes mellitus was made. Neither Dr. Bernstein's own records nor those of the hospital contain any notation of an accident in the history. (*See* Exhibit P–7, P–10, D–28)

22. On March 5, 1971, plaintiff's right third and fourth toes were amputated by Dr. Sherman Garrison. (Exhibits P–7, P–10, D–26, D–28)

23. Plaintiff was discharged from Bridgeton Hospital on March 17, 1971. He continued to see Dr. Bernstein regularly until May 19, 1971, the date of his last visit to Dr. Bernstein. (Exhibits P–7, P–10)

24. On June 2, 1971, plaintiff came under the care of Dr. William Serri. Dr. Serri's notes of the June 2 examination

include the following: "in Sept. 1970 dropped wt. on both feet." No other history of injury was noted. (Exhibits P–11, D–34)

25. On June 17, 1971, at the request of Dr. Garrison, a surgeon, plaintiff went to Intercounty Orthopedic Association for x-rays and an examination. During that visit, the following history was recorded:

"Injured rt. foot in Nov. 1970—treated by Dr. Bernstein—banged it on a barge at work, reinjured it in December, 1970, was on a cruise, got back on Jan. 8 . . ."

(Exhibit P–6)

26. Plaintiff was under the care of Dr. Serri and Dr. Jerome Cotler of the Intercounty Orthopedic Association throughout the summer of 1971. (Exhibits P–6, P–11, D–34)

27. Following a September 9, 1971 examination by Dr. Cotler, plaintiff was informed that he could return to work, and he did so on the following day. Upon his return, the following notation was made in ARCO's medical file:

"Man out since Jan. 8—probable diabetic ulcer—Now on insulin—Under care of Dr. Cotler."

The problem was classified as "non-industrial." (Exhibit P–1) A disability status report was filed listing the nature of plaintiff's disability as "Illness." (Exhibit D–3)

28. Following the 1970 and 1971 disabilities, plaintiff, through his union representative, Robert McMaken, initiated a grievance for sick-pay benefits.

29. On February 14, 1972, plaintiff filed a Master's Certificate of Service noting that he was "taken ill or injured while employed." (Exhibit P–3) Such certificates are filed to obtain necessary health care and are not limited to cases of on-the-job injuries.

30. On April 5, 1972, plaintiff worked on Atlantic Tug No. 5 from 0001 to 2155 hours (12:01 a. m. to 9:55 p. m.). (Exhibit 39(e))

31. From 1630 to 1645 hours (4:30 to 4:45 p. m.) on April 5, 1972, Atlantic Tug No. 5 was engaged in shifting Interstate Barge No. 29. (Exhibit 39(e))

32. From 1645 to 1825 (4:45 to 6:25 p. m.) on April 5, 1972, Atlantic Tug No. 5 was waiting for orders with regard to towing Interstate Barge No. 19. (Exhibit 39(e))

33. From 1825 to 2055 hours (6:25 to 8:55 p. m.) on April 5, 1972, Atlantic Tug No. 5 was engaged in towing Interstate Barge No. 19. (Exhibit 39(e))

34. The April 5, 1972 tow report for Atlantic Tug No. 5 contains the following entry, which immediately follows that for the 1825–2055 hour towing of Interstate Barge No. 19:

"Extra time for deckhand cook shifting unman. Barge Interstate # 29."

Unlike the other entries on the report, no specific times are noted for this item. The next item on the report is another towing assignment which lasted from 2055 to 2145 hours (8:55 to 9:45 p. m.).

A time log attached to the April 5 tow report contains an extra wages notation for the deckhand, G. Neubauer, and the cook/deckhand, M. Baczor (plaintiff), for "Docking & Undocking Unmanned Barge Interstate 29." (See Exhibit 39(e))

35. At all times material to this action, Atlantic Tug No. 5 was equipped with six "house lights" located beneath the overhang of the upper deck along each of its sides; two "deck lights" at its bow and two more "deck lights" at its stern; and a maneuverable searchlight atop the tug's upper deck. (See Exhibits D–42, D–43)

36. The tugboat's crew members had access to the switches controlling the tug's lights and could turn them on as needed.

37. All of the tug's lights were used at night, providing adequate illumination for work being done by the tug.

38. Plaintiff presented evidence that on April 5, 1972, while stepping onto Interstate Barge No. 29 from Atlantic Tug No. 5, he struck his left foot on a stanchion post holder affixed to the side of the barge.

39. Since the work on Interstate Barge No. 29 was done from 4:30 to 4:45 p. m. on

an April afternoon, the accident occurred during daylight hours.

40. Even if the natural lighting was inadequate at the time of the April 1972 accident, sufficient artificial lighting was available on the tug to illuminate the work area, and plaintiff had access to the switches controlling this lighting.

41. Plaintiff did not report the April 1972 accident to the tug's master.

42. On April 6, 1972, plaintiff visited Dr. Serri, who found that plaintiff's left fifth toe had undergone a gangrenous change. (Exhibits P–11, D–34) The gangrenous change could not have occurred within a 24 hour period.

43. Plaintiff presented evidence that, as a result of the injury, he did not report for work on April 7, 1972 and did not return to work for one year thereafter.

44. Plaintiff presented evidence that while he was absent from work following the 1972 incident, he notified defendant's dispatcher of his absence due to disability.

45. On April 22, 1972, plaintiff was admitted to Newcomb Hospital with a provisional diagnosis of a gangrenous left toe and foot. A hospital report prepared by Dr. Baxter noted, in part:

"This is a 56-year old white male diabetic whose peripheral vascular troubles stemmed from November 16, 1970, when while working on a ship, he injured his right fourth toe. The toe became gangrenous, and the patient's third toe showed similar changes . . . . [The report then recounts the first amputation.] He then had no further appreciable trouble and apparently did not have intermittent claudication until 4/6/72 when after an injury, an ulcer appeared on the *left* fifth toe. The fifth toe became gangrenous. . . .

Past medical history showed that the patient was apparently in good health till the injury, which occurred in 1970. The diabetes was apparently discovered when he was hospitalized subsequent to that injury . . . . He has complained of numbness of both feet since Nov. 1970." (Emphasis in original)

Exhibits P–12, D–29)

46. On April 25, 1972, plaintiff's left fifth toe was amputated by Dr. Baxter. (Exhibits P–12, D–29)

47. On May 12, 1972, plaintiff was discharged from Newcomb Hospital with a final diagnosis of "Diabetes mellitus with peripheral vascular disease & gangrene of l.* foot." (Exhibits P–12, D–29)

* Apparently abbreviation for "left."

48. On July 11, 1972, plaintiff's supervisor, F. W. Welsh, mailed to plaintiff a "Report of Attending Physician" form, which was to be completed by plaintiff's doctor. The accompanying letter stated that, "Although we have some limited information concerning your illness," the form was needed "in order to complete our records." (*See* Exhibit D–1) Dr. Serri had his secretary fill out the form. Pertinent entries * are as follows:

* For the sake of clarity, the questions have been underscored.

What was the cause of disability? (Please state diagnosis in full)—Diabetes Mellitus, obliviated vascular disease of both legs, and recent removal of gangrenous 5th toe of right foot.

If disability is due to accident, please give details of accident—A boat accident occurring on the job. (part of the disability)

On what date did patient become disabled?—April 5, 1972.

Time—evening.

The completed form was dated July 26, 1972. (*See* Exhibits P–2, D–32)

49. Beginning in the summer of 1972, defendant carried on a series of communications with plaintiff in an attempt to arrange disability and retirement benefits. Plaintiff's accidents were not mentioned in the letters sent by defendant. (*See* Exhibits D–4, D–5, D–8)

50. In November 1972, plaintiff filed another Master's Certificate of Service, noting that he was "taken ill or injured while employed." (*See* Exhibit P–4)

51. In late 1972 or early 1973—the date is uncertain—a meeting was held among plaintiff, Union Representative Robert McMaken, and ARCO Employee Relations Supervisor James B. Cooney. Plaintiff's disability was discussed at the meeting.

52. On April 13, 1973, plaintiff returned to work following a one-year absence. An entry was made in his ARCO medical record, noting that he had had diabetes mellitus, gangrene had developed in his left leg, and a skin graft had been performed. (Exhibit P–1) A disability status report was filed, listing the nature of plaintiff's disability as "Diabetes mellitus." (Exhibits D–6, D–7)

53. Finding himself unable to work, plaintiff left work permanently on June 15, 1973.

54. On June 19, 1973, following a denial by the Social Security Administration of plaintiff's request for disability insurance benefits, Dr. Serri wrote a letter to a Mrs. Weinstein at the Social Security Administration in which he protested the denial and mentioned an injury of September 1970. (Exhibit D–35)

55. On May 15, 1974, plaintiff telephoned defendant's attorney, John T. Biezup, and told him of a November 1970 injury with a shackle while aboard Atlantic Tug No. 5. As a result of that phone call, defendant's attorneys undertook an investigation which included an inquiry directed to plaintiff's doctors. (See Exhibits P–5, D–20, D–44, P–8) In reply to the inquiry, Dr. Serri, in a letter of August 31, 1974, provided defendant with a medical history mentioning work-related injuries of November 1970 and January 1971. Dr. Bernstein, in an October 25, 1974 response, advised defendant that he had no record of any injuries to plaintiff. (Exhibits P–13, P–9)

56. Throughout 1974, defendant on several occasions attempted to communicate with plaintiff concerning his disability and retirement benefits. (See Exhibits D–9, D–10, D–12) Benefits were finally arranged through plaintiff's attorneys. (See Exhibits D–11, D–13, D–14, D–15, D–18, D–19) In the course of obtaining the benefits, plaintiff caused a medical report to be sent by Dr. Serri to ARCO's medical director, Dr. J. S. Biesenkamp, on December 11, 1974; the report mentioned work-related injuries of November 1970 and January 1971. (See Exhibits D–33, D–17. See also Exhibits D–36, D–16)

57. On October 30, 1974, defendant ended all lighterage operations.

58. Although plaintiff had retained counsel in 1974 to help him to obtain disability and retirement benefits, he did not tell his attorneys about the accidents until early 1975.

59. On June 5, 1975, plaintiff instituted the present suit, alleging claims of unseaworthiness, entitlement to maintenance and cure, and liability under the Jones Act, 46 U.S.C. § 688 (1970), all arising out of the three incidents alleged to have occurred in November 1970, January 1971, and April 1972.

60. A number of potential witnesses were unavailable to defendant at the time this suit was instituted: One had died, one had resigned, and a third had retired in 1972; and six had retired or were laid off in July and October 1974. (Exhibit D–41) Defendant also was unable to obtain certain relevant records which were mislaid or destroyed after its tugboat and lighterage operations had terminated.

61. During trial, plaintiff withdrew his claim under the Jones Act, recognizing that it was barred by the statute of limitations.

## DISCUSSION

■ Plaintiff alleges that he was injured on three separate occasions while a crewman on defendant's tugboat, Atlantic Tug No. 5, in November 1970, January 1971, and April 1972. On June 5, 1975, plaintiff instituted this action, asserting claims of unseaworthiness, entitlement to maintenance and cure, and liability under the Jones Act, 46 U.S.C. § 688 (1970), for each of the three alleged injuries. Plaintiff subsequently withdrew the Jones Act claims, recognizing that the three-year statute of limitations applicable to each of them had run in No-

vember 1973, January 1974,[1] and April 1975, respectively. *See generally* Jones Act, 46 U.S.C. § 688 (1970), *incorporating by reference* Federal Employers' Liability Act, 45 U.S.C. § 56 (1970); *McAllister v. Magnolia Petroleum Co.,* 357 U.S. 221, 225 n. 6, 78 S.Ct. 1201, 2 L.Ed.2d 1272 (1958).

As to plaintiff's claims under maritime law, to which no statute of limitations applies, defendant has raised the defense of laches. A laches defense necessarily implicates the merits of a controversy since it constitutes an averment that defendant has been so prejudiced by plaintiff's inexcusable delay in instituting suit that defendant cannot adequately defend on the merits. As hereinafter explained, I conclude that plaintiff's claim is barred by laches. Before discussing laches, however, it is appropriate to consider whether, apart from the question whether delay has prejudiced defendant's ability to defend against the claim, plaintiff has sufficiently established that his injuries resulted from the unseaworthiness of defendant's vessel. If plaintiff's own evidence fails to support a claim of unseaworthiness, of course, the issue of laches need not be reached.

## I. UNSEAWORTHINESS

### A.

Since the 1970 and 1971 accidents both allegedly resulted from the manner in which defendant stowed certain tow lines aboard Atlantic Tug No. 5, I shall discuss them together. Plaintiff presented evidence that the lines were coiled atop a grated wooden platform raised a few inches above the deck. They were protected from the natural elements by a canvas tarpaulin, half of which was placed between the lines and the platform and the other half of which was folded over the top of the lines. To prevent the canvas from being blown off, it was weighted down with a heavy shackle and hook. The shackle and hook were not tied down or secured in any way. Plaintiff's evidence is that both in November 1970 and in December 1970 or January 1971, while the tug was pulling away from a dock in the Schuylkill River, he attempted to remove the canvas tarpaulin to prepare the tow lines for use, and as he did so, an unsecured shackle atop the canvas slid off and struck his feet.

Plaintiff has not been able to establish the precise dates of either of these incidents. The records of one of plaintiff's physicians, Dr. William Serri, indicate that the first accident may have occurred in September 1970, but all the other evidence reflects that it probably occurred early in November 1970. With regard to the second accident, plaintiff has not even been able to establish the month in which it happened. He testified that it occurred in early or mid January 1971, but the only documentary evidence available—the records of the Intercounty Orthopedic Association[2]—indicates that it may have occurred in December 1970. Since plaintiff has failed to clarify the situation, I shall refer to the second incident as that of December 1970 or January 1971.

Plaintiff's testimony and his evidence as to the chronology of events are barely sufficient to support a finding that he was injured as a result of the two incidents involving falling shackles, but the evidence is not strong enough to support a more precise finding. In addition to the vague and contradictory evidence as to the dates of the

1. The events giving rise to plaintiff's second claim may have occurred in December 1970. *See* text accompanying note 2 *infra.* It is therefore possible that the statute had run as to that claim in December 1973.

2. Defendant contests the reliability of the Intercounty Orthopedic records. It is true that these records do contain a number of interlineations, some of which are highly relevant to this proceeding. The notation of plaintiff's second injury—dated December 1970—is not an interlineation, however. Moreover, I do not agree with defendant's contention that the interlineations are written in a different handwriting from that in the main body of the report. Rather, I accept the proffered explanation of Intercounty's office manager that whoever was taking plaintiff's medical history added the interlineations as an afterthought shortly after writing the main body of the report. I consider the report reliable.

accidents, there is a notable lack of supporting documentary evidence as to either of them. The medical evidence is far from persuasive as to the causation, particularly with regard to the second accident. The medical testimony indicates that the renewed foot problems suffered by plaintiff in January 1971 could have been caused by anything from a traumatic injury to poor personal hygiene. Although I am left with considerable doubt, plaintiff's evidence is barely enough to support a finding that sometime in 1970 or 1971—either from the November 1970 incident, or from the December 1970 or January 1971 incident, or from both—plaintiff was injured by falling shackles aboard Atlantic Tug No. 5. This requires consideration as to whether the accident(s) resulted from the unseaworthiness of defendant's tug.

■■■ "Unseaworthiness" refers to a condition aboard a vessel. *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 498, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971); *Earles v. Union Barge Line Corp.,* 486 F.2d 1097, 1102 (3d Cir. 1973). A shipowner is absolutely liable to a seaman for injuries resulting from the fact that things about the vessel—hull, decks, machinery, tools, stowage, cargo containers, etc.—are not reasonably fit for the purpose for which they are to be used. *Gutierrez v. Waterman Steamship Corp.,* 373 U.S. 206, 213, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *Mahnich v. Southern Steamship Co.,* 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); *Earles, supra,* at 1102–1103. Focusing upon plaintiff's injuries, "the crucial consideration is whether the ship was, in all respects pertinent to the injury, reasonably fit to permit plaintiff to perform his task aboard the ship with reasonable safety." *Walker v. Sinclair Refining Co.,* 320 F.2d 302, 304 (3d Cir. 1963), *citing Lester v. United States,* 234 F.2d 625, 628 (2d Cir. 1956), *appeal dismissed,* 352 U.S. 983, 77 S.Ct. 384, 1 L.Ed.2d 366 (1957) (per curiam).

■ Again by the barest margin, plaintiff's evidence is sufficient to support a finding that defendant's method of stowing the tow lines aboard Atlantic Tug No. 5 rendered that vessel unseaworthy. Any vessel may at times be subject to uncertain movement. Although it is hard to imagine movement of a violent nature on the calm waters of the Schuylkill River, nevertheless, to maintain an unsecured heavy object atop an elevated coil of rope on a floating vessel invites injury. The evidence disclosed that it was not necessary to stow the lines in the manner used by defendant. The master of the tug testified that the shackle and hook could have been tied down to keep them in place, or the lines could have been protected by a tarpaulin with grommets (eyelets) at the ends through which a rope could have been threaded to tie it down. On the basis of the evidence presented, I conclude that the use of an unsecured shackle and hook in the stowing of the tug's lines rendered the tug unseaworthy. The stowage method was not reasonably fit to permit plaintiff, whose duties included handling of the tow lines, to perform his tasks aboard the tug with reasonable safety.

I conclude that plaintiff's evidence is sufficient to support his claim that he sustained injuries in November 1970 and/or in December 1970 or January 1971 from the unseaworthiness of defendant's vessel.

### B.

■ The incident of April 1972 stemmed from a different factual situation. On April 5, 1972,[3] Atlantic Tug No. 5 was engaged in shifting an unmanned barge, Interstate Barge No. 29. Plaintiff's testimony was that during that operation, as he was stepping onto the barge from the tug, he struck his left foot on a stanchion post holder affixed to the side of the barge, injuring his left foot. Plaintiff contends

---

**3.** April 5, 1972 is the date on which plaintiff claims to have suffered his third injury. I note, however, that on the following day plaintiff visited Dr. Serri, who found that plaintiff's toe had undergone a gangrenous change. (*See* Exhibits P–11, D–34). The medical evidence is that such a change could not have occurred within a twenty-four hour period. Plaintiff has not clarified this inconsistency.

that the accident happened because of inadequate lighting aboard the tug. The evidence is not sufficient to support a finding of unseaworthiness from inadequate lighting.

First, it appears that the shifting operation took place during daylight. The tug's tow report for April 5 indicates that Interstate Barge No. 29 was shifted from 4:30 to 4:45 p. m. After waiting more than one-and-one-half hours for orders, the tug then went on two towing assignments, the first lasting from 6:25 to 8:55 p. m. and the second from 8:55 to 9:45 p. m. (Exhibit 39(e)) Inexplicably, at a point on the towing report between the entries noting the latter two towing operations, there is an untimed entry noting an extra time allotment for plaintiff for the shifting of Interstate Barge No. 29. (*See id.*) While the location of this entry on the tow report might lead one to believe that plaintiff performed additional work on Interstate Barge No. 29 after completion of the tug's 6:25–8:55 p. m. towing assignment, the testimony does not support that interpretation. I conclude that plaintiff's work on Interstate Barge No. 29 was performed between 4:30 and 4:45 p. m., a time at which natural lighting would have been sufficient to allow plaintiff to perform his duties safely.

I need not, and do not, however, rest my conclusion as to unseaworthiness on the sufficiency of natural light, for I find that even if the natural light was insufficient, Atlantic Tug No. 5 was adequately equipped with artificial lighting to enable plaintiff to perform his duties safely. The tug was equipped with six "house lights" along each of its sides, two "deck lights" at its bow, two more "deck lights" at its stern, and a maneuverable searchlight atop the upper deck. (*See* Exhibits D–42, D–43) This system provided adequate lighting for plaintiff's movement from the tug to the barge. There is no credible evidence that the lights were not operational at the time of the April 5 incident. Even if the lights were not turned on, the tug's crew members, including plaintiff, had ready access to the switches and could have turned them on

if needed. I therefore find that the lighting system aboard Atlantic Tug No. 5 was adequate and did not render the vessel unseaworthy.

Plaintiff has failed to establish that the injury of April 5, 1972 resulted from an unseaworthy condition. It will not be necessary, therefore, to consider whether the claim for that incident is barred by laches.

## II. LACHES

Since there is sufficient evidence to support a finding that plaintiff sustained injuries in November 1970 and/or December 1970 or January 1971 from the unseaworthiness of defendant's vessel, I must consider whether the claim is barred by laches. Laches is an equitable doctrine based upon delay in instituting suit. It consists of two elements: (1) a delay which is inexcusable, and (2) resulting prejudice to defendant. *Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1258 (3d Cir. 1974); *Kane v. Union of Soviet Socialist Republics*, 189 F.2d 303, 305 (3d Cir. 1951), *cert. denied*, 342 U.S. 903, 72 S.Ct. 292, 96 L.Ed. 676 (1952). It is an affirmative defense for the defendant, Fed.R.Civ.P. 8(c), but if the delay is for a period of time greater than that of an analogous statute of limitations, laches is presumed, and the burden of proof shifts to the plaintiff to rebut that presumption. *Gruca, supra*, at 1259; *Burke v. Gateway Clipper, Inc.*, 441 F.2d 946, 949–50 (3d Cir. 1971); *Mroz v. Dravo Corp.*, 429 F.2d 1156, 1160 (3d Cir. 1970); *Lipfird v. Mississippi Valley Barge Line Co.*, 310 F.2d 639, 642 (3d Cir. 1962); *Kane, supra*, at 305–06. The analogous period of limitations for personal injury claims under maritime law is the three-year period of the Jones Act, 46 U.S.C. § 688 (1970), *incorporating by reference* Federal Employers' Liability Act, 45 U.S.C. § 56 (1970). *Lipfird, supra; Flowers v. Savannah Machine & Foundry Co.*, 310 F.2d 135 (5th Cir. 1962); *Francis v. Pan American Trinidad Oil Co.*, 392 F.Supp. 1252, 1256 & n. 6 (D. Del. 1975). Since this period ran in November 1973 as to the first claim and in December 1973 or

January 1974 as to the second,[4] and since plaintiff did not institute suit until June 5, 1975, the rebuttable presumption of laches is applicable.

 Plaintiff concedes the first element of laches, inexcusable delay, but seeks to rebut the second, resulting prejudice. Defendant contends that plaintiff has the burden to disprove *both* elements in order to negate the defense. Although there is dictum supporting defendant's position,[5] courts which have directly faced the issue have rejected such a contention.[6] It is unnecessary to decide that question, however, for I conclude that plaintiff has failed to rebut the presumption of prejudice and therefore has disproved neither element.

Defendant produced affirmative evidence of prejudice. By the time plaintiff instituted this action, a number of potential witnesses had become unavailable and relevant records had disappeared. These losses hindered defendant's ability to defend. Defendant's disability is particularly important in light of the fact that, due to the age of these claims, plaintiff himself has been unable to recall significant details, including important dates. Plaintiff does not really contest these facts, but instead argues that any prejudice suffered by defendant was self-induced, since defendant had sufficient notice of plaintiff's injuries at the time that they occurred to enable it to conduct an investigation in preparation for possible litigation. *Cf. Claussen v. Mene Grande Oil Co.*, 275 F.2d 108, 113 (3d Cir. 1960); *Wounick v. Pittsburgh Consolidation Coal Co.*, 283 F.2d 325, 328 (3d Cir.), *cert. denied*, 364 U.S. 902, 81 S.Ct. 234, 5 L.Ed.2d 195 (1960) (listing defendant's knowledge of the accident as a relevant fact pertaining to

laches); *Smigiel v. Compagnie de Transports Oceaniques*, 185 F.Supp. 328, 330 (E.D. Pa.1960); *West v. Upper Mississippi Towing Corp.*, 221 F.Supp. 590, 594–98 (D.Minn. 1963), *appeal dismissed*, 338 F.2d 823 (8th Cir. 1964). *But see Naglis v. United States Lines Co.*, 250 F.Supp. 955 (E.D.Pa.1965). Even were I to agree with plaintiff's theory and to impose retroactively such an investigative burden upon defendant, however, I cannot agree that defendant had been sufficiently placed on notice of plaintiff's injuries.

First, the documentary evidence does not support a conclusion of sufficient notice. The only records in defendant's file which allude to a possible accident for which defendant might be liable are a November 23, 1970 entry in plaintiff's medical record stating that plaintiff "struck" his toe (Exhibit P–1) and a July 26, 1972 medical report from Dr. Serri stating that plaintiff became disabled in April 1972 during a "boat accident occurring on the job" (Exhibits P–2, D–32). The first of these could not place defendant on notice of possible liability. The second is so ambiguous that it also fails to indicate any liability of defendant, and, even if that were not true, is of little relevance since it refers only to the April 1972 incident with regard to which I have found there was no unseaworthy condition.

Secondly, I have found that plaintiff did not report the accidents to the tug's master. Plaintiff admits this reporting failure with regard to the second (and third) incidents, but he claims to have told the master of the first incident. The master testified to the contrary. While it is indeed hard to believe the master's testimony that *no* crew member was ever injured during his twenty-two

---

4. *See* note 1 and accompanying text, *supra*. *See also* text accompanying note 2, *supra*.

5. *See Lipfird, supra,* at 642; *Mroz, supra,* at 1160 (quoting *Lipfird*); *Ward v. Union Barge Line Corp.*, 443 F.2d 565, 568, 569 (3d Cir. 1971), *overruled on other grounds, Cox v. Dravo Corp.*, 517 F.2d 620 (3d Cir), *cert. denied*, 423 U.S. 1020, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975); *Burke, supra,* at 949–50; *Gruca, supra,* at 1259 (quoting *Burke*). *But cf. Kane, supra,* at 306.

6. *See Smigiel v. Compagnie de Transports Oceaniques*, 185 F.Supp. 328 (E.D.Pa.1960); *Lasseigne v. Nigerian Gulf Oil Co.*, 397 F.Supp. 465, 473 (D.Del.1975). *See also Cities Service Oil Co. v. Puerto Rico Lighterage Co.*, 305 F.2d 170, 171 (1st Cir. 1962); *West v. Upper Mississippi Towing Corp.*, 221 F.Supp. 590, 594 (D.Minn.1963), *appeal dismissed*, 338 F.2d 823 (8th Cir. 1964).

years as master of the tug, plaintiff's evidence is still insufficient to satisfy me that he reported the first incident to the master.

Plaintiff has also failed to persuade me by a preponderance of the evidence that he reported the November 1970 and the December 1970 or January 1971 accidents to ARCO's dispatchers. Plaintiff did testify that he telephoned the dispatchers to inform them of his absence from work, but he could not clearly recall whether he reported the accidents to them. Dispatcher George Barbarick testified that he also could not recall such reports and that his only recollection of plaintiff's alleged shackle injury was that he was told by plaintiff during a non-business-related conversation in "1968 or thereabouts" that "he dropped a shackle on one of his feet." There is no documentary evidence to support the claim that plaintiff reported the accidents to the dispatchers.

Plaintiff testified that he told his union representative, Robert McMaken, of his injuries and that McMaken gave defendant notice of the accidents. McMaken testified that he notified ARCO's representatives of plaintiff's accidents while he was seeking to obtain disability benefits for plaintiff. I find it hard to accept McMaken's testimony as credible, however. He was an obviously vigorous advocate of the rights of his fellow union members. Considering the fact that he himself had more than one lawsuit pending against defendant at the time of these events, it strains credulity that he would not have advised plaintiff to take legal action against defendant had plaintiff told him about the accidents.

Finally, the evidence is even inconsistent as to what plaintiff told his doctors about the accidents. Dr. Serri's records merely note that plaintiff dropped a weight on his feet; the history in Intercounty Orthopedic's records notes that plaintiff "banged [his foot] on a barge at work"; the 1972 Newcomb Hospital report vaguely refers to a 1970 "injury" aboard ship. None of these records record that plaintiff was injured by shackles. Most important, plaintiff's treating physician throughout 1970 and early 1971, Dr. Stanley Bernstein, made no record of an accident at all, although he testified that he normally would record such a history and is aware of the special importance of doing so in personal injury cases. While it is true that Dr. Bernstein could have inadvertently failed to record the history of an accident on one visit, I cannot believe that he would fail to do so for each of the many visits by plaintiff. The absence of an accident notation in the Bridgeton Hospital records is equally significant. The failure of plaintiff to tell his physicians of the accident supports the inference that he also failed to tell his employer.

Plaintiff did not directly notify defendant of the accidents until a May 15, 1974 telephone call to defendant's attorney, John T. Biezup. By that time, the Jones Act statute of limitations had run on the 1970–1971 claims, defendant was in the process of closing down its lighterage operations, and several of defendant's potential witnesses had become unavailable. Significantly, plaintiff did not even tell his present attorneys of the accidents until 1975 although he had retained them sometime in 1974 to obtain disability benefits for him. Plaintiff had permanently stopped working for defendant in June 1973, therefore, any reluctance he might have had about instituting legal action against his employer should certainly have ended at that time. Plaintiff admits that his delay in filing suit was inexcusable. That delay has forced defendant to defend an action in which the plaintiff himself has been unable definitively to establish the dates of his accidents due to the length of time which has passed. That plaintiff was injured is most unfortunate, but defendant has been prejudiced in its ability to defend against these stale claims by plaintiff's inexcusable delay in instituting suit, accordingly plaintiff's claim is barred by laches.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action under 28 U.S.C. § 1333(1) (admiralty or maritime cases) and under the Jones Act, 46 U.S.C. § 688.

**1382**

2. Plaintiff's claims under the Jones Act are barred by the statute of limitations. Jones Act, 46 U.S.C. § 688 (1970), *incorporating by reference* Federal Employers' Liability Act, 45 U.S.C. § 56 (1970).

3. (a) Plaintiff has presented evidence that he sustained injuries in November 1970 and/or December 1970 or January 1971 resulting from the unseaworthy method by which defendant stowed tow lines aboard Atlantic Tug No. 5.

(b) Plaintiff inexcusably delayed suing defendant for these injuries and this delay resulted in prejudice to defendant, hindering defendant's ability to defend this action.

(c) Plaintiff's claims for injuries from the November 1970 and/or the December 1970 or January 1971 incidents are barred by laches.

4. (a) Plaintiff has failed to establish that the lighting system maintained by defendant aboard Atlantic Tug No. 5 rendered the tug unseaworthy.

(b) Plaintiff has failed to establish defendant's liability for damages resulting from the incident of April 5, 1972.

5. Defendant is entitled to judgment in its favor.