Aaron D. GADDIS, Plaintiff,

v.

ORGULF TRANSPORT COMPANY, Defendant.

Civ. No. 86–4205.

United States District Court, S.D. Illinois, Benton Division.

Feb. 17, 1988.

Gordon Maag, Lakin, Herndon, Becker & Gitchoff, P.C., East Alton, Ill., for plaintiff.

Allen D. Allred, Thompson & Mitchell, Belleville, Ill., for defendant.

## MEMORANDUM AND ORDER

FOREMAN, Chief Judge:

This civil action involves several claims for damages by Aaron D. Gaddis for leg injuries suffered while plaintiff was working on the M/V ED RENSHAW for Orgulf Transport Company. Plaintiff's complaint asserts that Mr. Gaddis was injured because of the unseaworthiness of defendant's vessel under general maritime law as well as defendant's negligence under the Jones Act, 46 U.S.C. § 688. The plaintiff claimed at trial that he suffered physical and vocational disability, as well as pain and suffering, for approximately one year following his injury on April 28, 1985. Plaintiff's complaint also alleged that defendant wrongfully discharged plaintiff in retaliation for plaintiff's intention of filing a claim for the injuries resulting from the April 28, 1985 accident. This action was tried before the Court. After considering the testimony, exhibits, stipulations and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. On April 28, 1985, the plaintiff was employed by the defendant as a seaman and deckhand aboard the M/V ED RENSHAW, a tugboat owned and operated by the defendant, Orgulf Transport Company. On April 28, 1985, the M/V ED RENSHAW was located on the Mississippi River, a navigable stream, at Moore's Landing, Cairo, Illinois.

2. Plaintiff was a member of the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO ("SIU") while he was employed by Orgulf Transport Company. Plaintiff had been a SIU member for approximately five years preceding July 8, 1985.

3. On or about April 23, 1985, the plaintiff boarded the M/V ED RENSHAW on the upper Mississippi River to work for the defendant as a deckhand.

4. After plaintiff boarded the tugboat ED RENSHAW, it proceeded down the Mississippi with a compliment of barges to Moore's Landing. The barge tow was dropped off and the crew of the ED RENSHAW prepared to wire up another barge tow for a trip up river to Minneapolis, Minnesota.

5. On April 28, 1985, plaintiff was assigned to the "forward watch." Plaintiff stood watch from 6:00 p.m. to 12:00 a.m. on the day of his injury.

6. On April 28, 1985, at approximately 9:45 p.m., plaintiff was assigned to operate the capstan line in order to bring a barge tow alongside the M/V ED RENSHAW. The capstan was located in the bow of the boat, approximately five feet in front of the bulkhead. In order to properly operate the capstan, a deckhand would have to stand immediately in front of the bulkhead, where the capstan controls were located. In preparation for running the capstan, the plaintiff laid out a line 200 feet in length and 2–½ inches in diameter from the capstan directly out over the port side of the tugboat. One end of the line ran across an intervening empty barge and was secured to a full barge; the plaintiff coiled the other end around the capstan. A crew hand properly operating the capstan controls would have stood between coils of new line approximately five feet high and four feet wide. In effect, these stacks of line shielded someone standing at the capstan controls.

7. Defendant's Deckhand's Manual required crew members to stand clear of the capstan when a strain was on the capstan line. A capstan operator can relieve excessive strain on a capstan line by executing any of the following maneuvers: reversing the capstan, manually feeding the capstan slack line, or shutting the capstan switch off. All three of these operations can be performed while remaining at the capstan switch against the bulkhead. Plaintiff stood behind the capstan on the starboard

side, away from the controls and in the direct line of fire of the capstan line.

8. Plaintiff proceeded to perform his ordered assignment of drawing together the tow barges and the tugboat by operating the capstan. At about 11:00 p.m., excessive strain developed on the capstan line and it broke approximately seventy-five feet away from the capstan. The broken line rapidly retrogressed towards the capstan, striking plaintiff in the calves.

9. The force of the broken line knocked plaintiff onto a stack of iron ratchets lying on the deck. The only significant injury generating this lawsuit was to plaintiff's calves, which were swollen, deeply bruised, and painful.

10. Immediately after the accident, several crew members who witnessed the line break came to plaintiff's assistance. Sam Wilson, the first mate, cut plaintiff's pant legs to determine the seriousness of plaintiff's injury. Plaintiff was taken off the boat and driven to Sikeston Hospital, where a doctor X–rayed his legs and applied ice packs to reduce swelling. Finding no serious injury requiring hospital admittance, the doctor sent plaintiff home that same night.

11. Albert Mynes, the lead man and second mate on the M/V ED RENSHAW, and Russell Jeffries, a deckhand who witnessed the accident, examined the capstan rope that struck plaintiff and found it to be in very good condition.

12. Plaintiff was treated by J. Wills Oglesby, M.D. Dr. Oglesby's initial examination of plaintiff revealed that plaintiff's right calf was abraded and that both calves were bruised and very swollen. Although plaintiff was ordered not to work, no serious complications arising from the injury were evident. After several examinations, Dr. Oglesby observed that plaintiff's condition was essentially normal. Therefore, on June 14, 1985, Dr. Oglesby gave plaintiff a release letter allowing him to return to work on June 19, 1985.

13. At some point before plaintiff's return to work, a representative of Orgulf, Mr. Penny of Waterways Marina, allegedly visited plaintiff, suggested his injuries were minor, and requested that he seek treatment from another doctor. Plaintiff objected and ambiguously stated he would "see an attorney."

14. On June 19, 1985, plaintiff returned to work for Orgulf, but experienced pain in both legs. Plaintiff was unable to perform his duties without pain, so he consulted Dr. Oglesby, who advised plaintiff to leave the boat. Plaintiff stepped off the boat at a lock near St. Louis. Dr. Oglesby examined plaintiff's calves and found no irregularities other than plaintiff's complaints of tenderness and apprehension.

15. On July 8, 1985, Orgulf terminated plaintiff based upon the company's determination that plaintiff had performed poorly during his thirty-day probationary period. Copies of plaintiff's termination letter were sent to two SIU representatives. Plaintiff spoke with the two SIU representatives regarding his termination, but neglected to pursue any grievance procedures.

16. Dr. Oglesby re-examined the plaintiff on August 2, 1985 and on September 6, 1985. Plaintiff's condition steadily improved and on September 6, 1985, Dr. Oglesby once again released plaintiff to return to work.

17. At the date of trial, plaintiff claims to suffer present disability and discomfort; however, plaintiff only seeks damages for the year following the accident of April 8, 1985.

## CONCLUSIONS OF LAW

This Court has jurisdiction of the parties and subject matter of this action under general maritime law and the Jones Act, 46 U.S.C. § 688.

Plaintiff's complaint regarding injuries suffered while employed aboard defendant's vessel is premised upon a breach of the warranty of seaworthiness under general maritime law as well as Jones Act negligence. Plaintiff has also amended his original complaint to include two counts alleging retaliatory discharge. Specifically, plaintiff claims:

1. The defendant failed to provide plaintiff with a reasonably safe place in which to work.

2. The M/V ED RENSHAW was inadequately equipped with trained crew hands for the operation of the vessel.

3. Orgulf failed to furnish plaintiff with adequate equipment with which to perform his duties.

4. The defendant wrongfully terminated plaintiff in retaliation for plaintiff's intention of filing a claim against defendant.

In analyzing the law governing the outcome in this case, the Court will focus on the issues of the general maritime warranty of seaworthiness and Jones Act negligence. At the close of plaintiff's case-in-chief, this Court granted defendant's Motion for a Directed Verdict as to Counts IX and X, which arise out of the claim of retaliatory discharge. Plaintiff's failure to present sufficient evidence of retaliatory discharge was manifest. Nevertheless, the Court will elaborate herein on its finding that plaintiff neglected to pursue and exhaust his rights under the SIU collective bargaining agreement.

### I. The Warranty of Seaworthiness

■ The warranty of seaworthiness is a doctrine of liability without fault. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). A ship owner has an absolute and nondelegable duty to furnish a seaworthy vessel and appurtenances that are reasonably safe and fit for their intended use. 328 U.S. at 94–95 n. 11, 66 S.Ct. at 877 n. 11; *Weeks v. Alonzo Cothron, Inc.*, 466 F.2d 578 (5th Cir.1972); 2 M. Norris, The Law of Maritime Personal Injuries §§ 300–303 (3d ed. 1975). As a general rule, a seaman's contributory negligence will reduce the amount of damages for which the vessel owner is liable, but it will not extinguish the seaman's right to recovery. *Seas Shipping*, 328 U.S. at 94 n. 11, 66 S.Ct. at 877 n. 11.

Since the advent of steam navigation, courts have realized that vessels have evolved from simple sailing ships, whose seaworthiness any sailor could adequately judge, to complex vessels full of complicated and dangerous machinery. Only skilled experts could ascertain seaworthiness by carefully examining a ship's machinery and appliances. Hence, an absolute duty was imposed upon shipowners to furnish seaworthy vessels and injured seamen became entitled to greater compensation than that afforded by "maintenance and cure." 328 U.S. 85, 91 n. 9, 66 S.Ct. 876 n. 9; *see also Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 103, 64 S.Ct. 455, 459, 88 L.Ed. 561 (1944).

■ Nevertheless, an exception arises to the shipowner's absolute duty when the seaman's negligence is the sole cause of his injury, *Boudreaux v. Sea Drilling Corp.*, 427 F.2d 1160 (5th Cir.1970), or where the injury results from the "negligent use of an otherwise seaworthy vessel." *Peymann v. Perini Corp.*, 507 F.2d 1318, 1322 (1st Cir.1974), *cert. denied*, 421 U.S. 914, 9 S.Ct. 1572, 43 L.Ed.2d 780 (1975). When a seaman is the cause of his own misfortune, he will be barred from recovery. *Boudreaux*, 427 F.2d 1160, 1161 (5th Cir.1970).

■ Based on this exception, defendant argues that the plaintiff cannot recover under a claim of unseaworthiness. Upon consideration of all the evidence and testimony in this case, the Court finds that plaintiff created the hazard that caused his injury and that he is therefore precluded from recovery based on a claim of unseaworthiness.

While plaintiff's complaint alleged that defendant did not retain an adequate number of trained crew hands for safe operation of the vessel, plaintiff's statements during trial and his case-in-chief informed this Court that the only issue of seaworthiness before the Court was whether the capstan rope was a reasonably fit and seaworthy appliance.

Much of plaintiff's testimony strained this Court's credulity. Plaintiff stated that he repeatedly sought permission to prepare a new capstan line because it, like "all the lines," was frayed and in poor condition. Allegedly, the Captain, Pilot, first mate Sam Wilson, and second mate Albert Mynes were all entreated to allow plaintiff to make a new capstan line. Failing to

receive authority to make a new line, plaintiff used the available line and began to operate the capstan. Approximately fifteen minutes later, plaintiff observed great strain on the line and alleged it attenuated from 2½ inches to one inch and began to "melt down." Plaintiff observed the line for what he variously described as a "split second" and "one and a half seconds" during which he saw the line rapidly deteriorate. When the line broke and struck plaintiff in the calves, it allegedly catapulted plaintiff twenty feet in the air. Plaintiff fell head first on a stack of iron ratchets, yet his only significant injury was that inflicted by the rope. Plaintiff produced no corroborating evidence or witnesses and admitted that even a new line would break if subjected to excessive strain.

Albert Mynes, the second mate and "lead man," was responsible for supervising the men on plaintiff's shift and inspecting the lines to ensure that they were in good condition. Mynes testified that any worn lines are immediately replaced. While Mynes was not an eyewitness to the accident, he came to plaintiff's aid soon after the rope broke. After plaintiff was taken off the towboat, Mynes examined the broken capstan line and found it to be in very good condition with no signs of defect. The witness echoed the plaintiff's observation that a new line could break if the capstan were operated improperly, thereby putting excessive strain on the line.

Defendant also put Russell Jeffries, a deckhand who witnessed the accident, on the stand. Jeffries stood on the starboard head deck about six feet from the plaintiff when the accident occurred. Jeffries stated that prior to and during the accident, plaintiff was standing along the capstan's starboard side away from the controls. The witness stated that in order to operate the capstan properly, one should stand by the controls out of harm's way. After the accident, which the witness attributed to excessive strain on the line, Jeffries examined the broken line and found it to be in good condition. The location of the break simply indicated that the line had been pulled apart. Mr. Jeffries and Mr. Mynes both disputed plaintiff's contention that he

had repeatedly complained about the condition of the capstan line and requested permission to make a new line.

It is well-settled that the mere happening of an event is not proof of either negligence or unseaworthiness. *Logan v. Empresa Lineas Maritimas Argentinas*, 353 F.2d 373 (1st Cir.), *cert. denied*, 383 U.S. 970, 86 S.Ct. 1276, 16 L.Ed.2d 310 (1965); *Mosley v. Cia. Mar. Adra, S.A.*, 314 F.2d 223, 228–29 (2d Cir.), *cert. denied*, 375 U.S. 829, 84 S.Ct. 73, 11 L.Ed.2d 61 (1963); *see also, In re Marine Sulphur Queen*, 460 F.2d 89, 99 (2d Cir.1972). In the instant case, plaintiff has failed to provide any evidence or corroborating testimony that would permit this Court to find that a defect in the capstan line proximately caused his injury.

In a similar case, *Tanzi v. Deutsche Dampfschiffahrts–Gesellschaft Hansa*, 355 F.Supp. 432 (S.D.N.Y.1973), a longshoremen was injured while unloading cargo from a ship when a metal band fastened around a carton broke apart and lacerated the plaintiff's fingers. Tanzi's failure to present the slightest hint of evidence establishing the cause of the breakage compelled the court to grant a directed verdict in defendant's favor. *Id.* at 435.

In *Mosley*, 314 F.2d 223 (2d Cir.1963), the court had to decide whether a hook used to dislodge scrap metal that obstructed a chute leading from the deck to the hold was reasonably fit for its intended purposes. The court concluded that plaintiff presented insufficient proof of unseaworthiness:

> Mosley failed to put in any proof that the hook was defective, worn, weakened, broken, improperly designed, insufficiently strong, excessively old, or in any other way unfitted or unsuited for its intended use."

314 F.2d at 228.

While the instant plaintiff did contend that the capstan line was worn, he offered no proof beyond his own testimony that such was the case. The testimony of all other witnesses is consistent in refuting plaintiff's version of events, and strongly

suggests that the capstan line would not have broken if plaintiff had properly operated the capstan controls. It has been held that a plaintiff must only prove unseaworthiness by the "barest margin" of evidence. *Baczor v. Atlantic Richfield Co.,* 424 F.Supp. 1370 (E.D.Penn.1976). Plaintiff has not presented any evidence or corrobative testimony that would justify a finding that plaintiff's burden has been met. The Court therefore finds that the M/V ED RENSHAW was reasonably fit to permit plaintiff to perform his task aboard ship with reasonable safety and thus, was in seaworthy condition. The proximate cause of plaintiff's damage was not any defect in the capstan line; rather, plaintiff's improper operation of the capstan led to his injury.

## II. Jones Act Negligence

In a Jones Act negligence case, a plaintiff has the burden of proving that the vessel owner's negligence proximately caused his injuries. *Chisholm v. Sabine Towing & Transport, Inc.,* 679 F.2d 60 (5th Cir.1982); *Thornton v. Deep Sea Boats, Inc.,* 399 F.Supp. 933 (S.D.Ala.1975). One court has defined a vessel owner's negligence under the Jones Act as follows:

> Negligence is the failure to exercise the degree of care which an ordinary prudent person would use under the circumstances in discharging the duty that he owes to those who work on a vessel. The shipowner has a continuing duty to provide a reasonably safe place to work and to use ordinary care to maintain the vessel in a reasonably safe condition.

*Clements v. Chotin Transport, Inc.,* 496 F.Supp. 163, 165 (M.D.La.1980). The mere fact that an injury occurred does not give rise to a Jones Act claim. An injured seaman seeking recovery must produce evidence indicating that the shipowner or his employees were negligent. *See Marvin v. Central Gulf Lines, Inc.,* 554 F.2d 1295 (5th Cir.1977), *reh. denied,* 559 F.2d 29, *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Kent v. Shell Oil Co.,* 286 F.2d 746 (5th Cir.1961); *Carlton v. M/G Transport Services, Inc.,* 698 F.2d 846 (6th Cir.1983). The plaintiff in this case has failed to prove that any negligent action or omission of the defendant proximately caused plaintiff's injury. Thus, the Court finds that plaintiff is not entitled to recover under the Jones Act from the defendant for the accident of April 28, 1985.

## III. Retaliatory Discharge

At the close of plaintiff's case in chief, defendant moved this Court to direct the verdict on Counts IX and X, which allege retaliatory discharge, in its favor. The court of appeals for this circuit has held that a district judge should direct a verdict where the evidence, with all justifiably deducible inferences, will not support a verdict in favor of the party producing it. *Hohmann v. Packard Instrument, Inc.,* 471 F.2d 815, 819 (7th Cir.1973). This circuit's formulation of its standard is derived from the long-standing rule that

> when the evidence in a case is such that without weighing the credibility of witnesses there can be but one reasonable conclusion as to the verdict to be reached, a district judge should determine the proceeding by directing the verdict, without submission to the [finder of fact]....

> *See Brady v. Southern Ry. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943); 9 Wright & Miller, Federal Practice and Procedure § 2524 (1971).

*Panter v. Marshall Field & Co.,* 486 F.Supp. 1168, 1184 (N.D.Ill.1980).

Orgulf Transport Company employed plaintiff pursuant to a collective bargaining agreement ("Agreement") between Orgulf and the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL–CIO. Under the Agreement, Orgulf recognized the union as the sole bargaining agent for the covered employees. Orgulf secured plaintiff for employment through the union hiring hall, pursuant to the terms of the Agreement. (*See* Document No. 24, Agreement, Art. I, § 2.) Defendant terminated plaintiff's employment on July 8, 1985, for poor work performance. Defendant deemed plaintiff as being a probationary employee for having worked less than 30

days. Plaintiff disputes this characterization, citing defendant's employee master record, which states that plaintiff was last rehired by defendant on April 23, 1985. For purposes of defendant's motion, however, plaintiff's status is nondispositive. The crucial issues which both this Court and the parties have identified are whether plaintiff grieved his complaint under the collective bargaining agreement and whether his retaliatory discharge claims are preempted by federal law.

### 1.) Preemption Under Section 301 of the Labor Management Relations Act.

The United States Supreme Court has recognized that § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, preempts state-law claims involving matters subject to grievance under a collective bargaining agreement. *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). The court noted that:

> If respondent had brought a contract claim under § 301, he would have had to attempt to take the claim through the arbitration procedure established in the collective-bargaining agreement before bringing suit in court. Perhaps the most harmful aspect of the Wisconsin decision is that it would allow essentially the same suit to be brought directly in state court without first exhausting the grievance procedures established in the bargaining agreement. The need to preserve the effectiveness of arbitration was one of the central reasons that underlay the Court's holding in *Lucas Flour. See* 369 U.S., at 105, 82 S.Ct., at 577. The parties here have agreed that a neutral arbitrator will be responsible, in the first instance, for interpreting the meaning of their contract. Unless this suit is preempted, their federal right to decide who is to resolve contract disputes will be lost.

471 U.S. 202, 105 S.Ct. 1904, 1915, 85 L.Ed.2d 206. *See also, Mitchell v. Pepsi Cola Bottlers, Inc.,* 772 F.2d 342, 346 (7th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1266, 89 L.Ed.2d 575 (1986) (§ 301 preempts "issues which could have been resolved by grievance and arbitration").

In *Mitchell v. Pepsi–Cola Bottlers, Inc.,* 772 F.2d 342, the Seventh Circuit Court of Appeals stated that "federal law governing these section 301 cases includes a federal policy favoring arbitration of labor-management disputes, *United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346–47, 4 L.Ed.2d 1403 (1960) (*Steelworkers I*); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960) (*Steelworkers II*), and a federal interest in uniformity of result, *Local 174, Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 103, 82 S.Ct. 571, 1352–53, 7 L.Ed.2d 593 (1962)." 772 F.2d at 345.

In *Allis Chalmers,* the Supreme Court stated that § 301 preempts state law claims where they "could have been pleaded as a contract claim under § 301.... The requirements of § 301 ... cannot vary with the name appended to a particular cause of action." 105 S.Ct. at 1916. The court stated that:

> The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

*Id.* at 1911. If courts permitted diverse state laws to divine the meaning parties intended in particular contract phrases or terms, uncertainty and disputes as to the nature of the agreement would proliferate. *Id.*

### A) Preemption Arises When the Collective Bargaining Agreement Covers the Subject Matter of the Suit.

Subsequent to *Allis–Chalmers,* the courts of appeals have repeatedly cited

Congress's intention that the National Labor Relations Act replace inconsistent state laws with a uniform national labor policy. If the provisions of the collective bargaining agreement cover the subject matter of the suit, state law claims are preempted by federal law. The Seventh Circuit has declared that "a state cannot be allowed, merely by the label it attaches to the cause of action, to interfere with the administration of a federal statute." *Graf v. Elgin, Joliet and Eastern Ry. Co.*, 790 F.2d 1341, 1345 (7th Cir.1986). *See also, Lingle v. Norge Div. of Magic Chef, Inc.*, 823 F.2d 1031, *cert. granted,* — U.S. ——, 108 S.Ct. 226, 98 L.Ed.2d 185 (1987); *Gibson v. AT & T Technologies, Inc.*, 782 F.2d 686, 688 (7th Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986) ("despite plaintiffs' attempt to characterize their action under state tort law, their action actually arises from a collective bargaining agreement and thus is controlled by federal law"); *Mitchell v. Pepsi–Cola Bottlers, Inc.*, 772 F.2d at 346 (7th Cir.1985) (claims preempted because they "presented issues covered by the collective bargaining agreement").

█ The Agreement contained specific grievance and arbitration procedures. (*See* Document No. 24, Agreement, Art. II.) When defendant terminated plaintiff on July 8, 1985, the defendant notified two union representatives of the action it had taken. Plaintiff did not take any steps under the Agreement to contest his termination other than to call his union representatives and ask them to inquire into his discharge. The plaintiff conceded that he never filed a grievance; had he done so, the Agreement provided that plaintiff could further pursue his grievance by submitting the dispute to arbitration. The Agreement also stated that an employee's failure to pursue a grievance ended any dispute and provided the company with "a complete and bona fide defense to any action or proceeding contrary to the terms hereof." (Document No. 24, Agreement, Art. II, para. D.)

This Court finds that the plaintiff neglected to follow procedures under the Agreement that provide for resolution of disputes with the company through grievance and arbitration.[1]

The facts established by the proof, and the inferences reasonably drawn therefrom, so strongly and overwhelmingly favor defendant that the Court is convinced that plaintiff's claim of retaliatory discharge is legally unfounded. Accordingly, defendant's Motion for a Directed Verdict on Counts IX and X is hereby GRANTED.

### CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Clerk of the Court is hereby ORDERED to enter final judgment in favor of defendant and against the plaintiff on Counts I, II, IX, and X of the Amended Complaint.

IT IS SO ORDERED.

---

1. Plaintiff has never suggested or offered evidence that the union breached its duty of fair representation in this matter or that any other exception to the exhaustion requirement applies. *See Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652 (1965); *D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1488–89 (7th Cir.1985).