Richard D. BURDEN and Mabel C. Burden, Plaintiffs,

v.

EVANSVILLE MATERIALS, INC., Defendants.

Civ. A. No. C–81–0148–O(M).

United States District Court,
W.D. Kentucky,
Owensboro Division.

Feb. 24, 1986.

Moore & Moore by Hugh D. Moore, Owensboro, Ky., for plaintiffs.

Stites & Harbison by John L. Tate, Louisville, Ky., for defendants.

## MEMORANDUM OPINION

MEREDITH, District Judge.

This civil action involves various claims for damages by Richard D. Burden and Mabel C. Burden (Plaintiffs) against Evansville Materials, Inc. (Defendant) for a lower back injury allegedly suffered while Mr. Burden was in the employ of the Evansville Materials, Inc. The damages claimed are: (1) compensation for Mr. Burden's pre-trial loss of wages and post-trial impairment of earning capacity; (2) compensation for physical pain, mental anguish and loss of enjoyment of life, past and future; (3) compensation for past unreimbursed medical expenses as well as future medical expenses; (4) compensation for maintenance and (5) Mrs. Burden's compensation for past and future loss of her husband's society. Plaintiffs' complaint against the defendant alleges that Mr. Burden's injury occurred because of the unseaworthiness of the defendant's vessel under general maritime law as well as defendant's negligence as characterized by the Jones Act; 46 U.S.C. 688. The plaintiff claims that he is both physically and vocationally disabled in a permanent sense and that the judgment prayed for in plaintiff's Second Amended Complaint is realistic and equitable. This action was tried before the Court. Having considered the testimony, exhibits, stipulations and arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiffs are residents and citizens of the Commonwealth of Kentucky.

2. The defendant is an Indiana Corporation.

3. On or about August 13, 1980, Mr. Burden (hereinafter referred to as plaintiff) was employed as a seaman/deckhand aboard the M/V A.W. Mulzer, a tugboat owned and operated by the defendant. On August 13, 1980, the A.W. Mulzer was operating on the Ohio River, a navigable stream.

4. On or about August 7, 1980, the plaintiff boarded the A.W. Mulzer somewhere in the general vicinity of Rockport, Indiana. The plaintiff had been employed by the defendant as a temporary deckhand to replace a regular crew member who was off.

5. After plaintiff boarded the A.W. Mulzer, the tugboat, with a compliment of loaded barges, moved down river to the general vicinity of Evansville, Indiana, where its tow was dropped. The A.W. Mulzer then picked up a tow of empty barges and proceeded back up river to the point of its original departure somewhere in the vicinity of Rockport, Indiana.

6. On or about August 8, 1980, one of the four deckhands of the A.W. Mulzer left its service to join another company vessel; thus, leaving only three deckhands aboard the A.W. Mulzer.

7. On or about August 9, 1980, the A.W. Mulzer was secured to a tow of five barges loaded with gravel for a trip up river to the destination of Point Pleasant, West Virginia. The A.W. Mulzer's crew consisted of seven individuals at the time

of departure. The crew was comprised of a captain, pilot, engineer, cook and three deckhands.

8. Two of the three deckhands alternated six hour watches. The third deckhand served on the "call watch" or was on call as needed. The plaintiff was assigned the "after watch." Plaintiff stood watch from 12:00 P.M. to 6:00 P.M. on the day of his injury.

9. On or about August 13, 1980, the plaintiff was ordered by the A.W. Mulzer's Captain to move two stacks of coiled cables or "wires" from the deck of the A.W. Mulzer to the deck of the barge immediately adjacent to it. The "wires" were ordered moved so that the deck of the towboat could be cleaned and painted.

10. The two stacks of cables were located approximately one to five feet from the bow of the A.W. Mulzer. The actual locations of the two stacks were estimated with the exact locations being unknown. The stacks of cables were approximately waist high. The individual cables were approximately one inch in diameter, 51 feet in length and weighed anywhere from 85 to 94 pounds. This variation in weight was dependent on whether cleavices or chain links were still attached to the "wires" after being stacked.

11. Plaintiff proceeded to perform his ordered assignment of moving the "wires" by pulling a coil from the stack and standing it on the deck. Plaintiff would carry the coil to the edge of the A.W. Mulzer and "sling" it onto the deck of the barge immediately facing the towboat. Plaintiff moved approximately one-half of the cables in this manner until the top coil hung up on the stack below. To free the cable, plaintiff leaned over the stack of cables with his arms extended in front of him parallel with the deck of the vessel. Plaintiff then grabbed the obstructed coil on both sides and lifted it straight up. At this point in time, plaintiff felt a pain in his lower back. This pain was enhanced when plaintiff attempted to sling the freed cable onto the adjoining barge. Plaintiff did not attempt to move any of the remaining cables during

his watch. Plaintiff went to the pilot house; explained to the pilot what had happened and rested the remainder of the shift.

12. An alternate method of moving "wires" was widely known and used in the shipping industry which involved shouldering the "wires." Plaintiff knew of this method, had on the job training regarding this method and had used this method many times during his years as a deckhand/pilot. The plaintiff had never used the method of moving/carrying "wires" that he utilized at the time of his accident.

13. This incident was not officially logged in the A.W. Mulzer's logbook as an "injury and/or accident" as required by defendant's company policy as stated by the Vice-President, Captain and Pilot of the defendant corporation.

14. Plaintiff, believing he had merely sprained muscles, continued to stand his watches and did light work while avoiding heavy lifting until the A.W. Mulzer docked at Rockport, Indiana, on August 16, 1980. During the period of time from the occurrence of the accident until the A.W. Mulzer docked, plaintiff treated the discomfort of his back and left leg by applying Ben-Gay ointment and by taking Tylenol.

15. After arriving home on August 16, 1980, plaintiff remained in pain and scheduled an appointment with his family physician, Dr. John Tapp, on August 19, 1980.

16. Medical treatment of plaintiff's low back pain began on August 19, 1980, when he was admitted to the hospital. Treatment at that time was of a conservative nature and involved bed rest, heat massage, physical therapy, and ultrasound. This treatment effectively took the pressure off plaintiff's low back and he was discharged from the hospital. Follow-up visits to the treating physician by the plaintiff on September 3 and 10, 1980, indicated improvement by the plaintiff with permission by Dr. Tapp that the plaintiff could return to work. On September 17, 1980, plaintiff returned to his family physician with complaints of inability to walk or sit in

the same place for any considerable length of time. Plaintiff testified his back began hurting more after having gone hunting, although he said he only hunted for a short period of time and did nothing to aggravate the injury. Plaintiff was re-admitted to the hospital on September 17, 1980. Plaintiff's family physician continued the conservative treatment of plaintiff that had been previously utilized. Plaintiff showed no signs of improvement. Approximately ten days after the date of plaintiff's second admission to the hospital, plaintiff's family physician called in Dr. Van Fisher, an orthopedic surgeon, for consultation.

17. Dr. Fisher diagnosed a rupture of an intervertebral disc which was confirmed by a myelogram. Dr. Fisher operated on the plaintiff on September 26, 1980, for this diagnosed condition. Plaintiff was released from the hospital on October 1, 1980. The plaintiff was re-admitted to the hospital after incurring pain in his low back caused by a sneezing episode. Dr. Fisher performed a second myelogram on the plaintiff and diagnosed a different defect which was caused by scar tissue developing after the initial surgery. Plaintiff was dismissed from the hospital after this third admission on November 12, 1980.

18. Plaintiff received injections of anesthetic agents as well as steroids from Dr. Fisher. Plaintiff continued to complain of discomfort and pain and subsequently sought treatment from a second orthopedic surgeon, Dr. G. William Davis in January of 1981. Dr. Davis diagnosed a ruptured disc which was confirmed by a myelogram. Dr. Davis operated on the plaintiff again at the L5–S1 level as well as the L4–L5 level. He also performed a spinal fusion and inserted an eight centimeter Knodt Rod. Plaintiff was dismissed on February 25, 1981.

19. Plaintiff improved after the operations with recommendations by Dr. Davis to increase his activity level. This improvement on plaintiff's part continued until sometime in late 1981. Dr. Davis next saw the plaintiff in November, 1981, after plaintiff had an increase in pain and a reduction in his activity level. On November 4, 1981, Dr. Davis removed the rod and wires and performed a second spinal fusion. Plaintiff remained under Dr. Davis's care throughout 1982, again showing signs of improvement and stability resulting from the operations.

20. Plaintiff was re-examined by Dr. Fisher on May 25, 1983, and x-rays indicated that the second fusion at the L5–S1 level had broken down. A February 15, 1984, CT scan revealed that there was no union between the L4 and L5 vertebra and that further complications, i.e., scar tissue development, had progressed to such a degree that the plaintiff's low back could not be effectively x-rayed. No additional lower back surgery has been performed on the plaintiff.

21. Plaintiff was also treated by a physician in or around November, 1976, for an injury to his lower back.

22. At date of trial, plaintiff's continuing treatment for pain and discomfort included prescribed medication and chiropractic adjustments.

23. As stipulated at trial, plaintiff has received $27,981.38 in reimbursed medical expenses and $8,100.00 in reimbursed lost wages.

## CONCLUSIONS OF LAW

The Court has jurisdiction of the parties and of the subject matter of this action under general maritime law and the Jones Act, 46 U.S.C. § 688.

As previously stated, plaintiff initiated this action complaining of injuries suffered while employed aboard one of defendant's vessels. Plaintiff has grounded his complaint upon the breach of warranty of seaworthiness under general maritime law as well as Jones Act negligence. Specifically, plaintiff claims:

1. The defendant assigned the plaintiff to individually perform a task which required a minimum of two deckhands to perform in a reasonably safe manner;

2. The M/V A.W. Mulzer with its tow of five loaded barges was inadequately

crewed with only three deckhands, resulting in only one deckhand being on regular watch at any given time; and

3. The defendant furnished equipment (stacked, coiled "wires" with shackles and cleavices attached) which was not safe for the use the defendant directed the plaintiff to make of it.

Plaintiff has stated in his pleadings and subsequently at trial that his claims under general maritime law and the Jones Act overlap and stem from a common set of operative facts. Plaintiff states that liability on the defendant's part can be predicated on either theory and that no conflict exists between the two. The Court agrees and finds that a determination of both unseaworthiness and Jones Act negligence is not required to mandate a finding of liability in the case at bar.

The analysis of the law in this case must focus on the four major issues of: (A) seaworthiness, (B) Jones Act negligence, (C) contributory negligence, and (D) damages. The issues of seaworthiness and negligence will be addressed in reference to the three specific allegations of wrongdoing as complained of by the plaintiff and stated above.

### A. Seaworthiness

A vessel owner has a duty to furnish a seaworthy vessel and appurtenances which are reasonably safe and fit for their intended use. This includes the hull, decks, tools, stowage and cargo containers. This duty is absolute, non-delegable and "results in a kind of liability without fault that may be incurred without negligence." *Weeks v. Alonzo Cothron, Inc.*, 466 F.2d 578 (5th Cir., 1972). The warranty of seaworthiness is independent from the duty of reasonable care imposed by the Jones Act which will be discussed later in this opinion.

The absolute duty imposed upon vessel owners is born from the conditions of the seaman's employment. The seaman has been deemed a ward of the admiralty and a large responsibility for his safety has been placed on the shoulders of the vessel owner. The basis for this rationale is succinctly stated in *Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). The *Mahnich* Court in justifying the need and existence of this absolute protection for seaman stated at page 103, 64 S.Ct. at 459:

> He (the seaman) is subject to the rigorous discipline of the sea, and all the conditions of his service constrain him to accept, without critical examination and without protest, working conditions and appliances as commanded by his superior officers. These conditions, which have generated the exacting requirement that the vessel or the owner must provide the seaman with seaworthy appliances with which to do his work, likewise require that safe appliances be furnished when and where the work is to be done.

However, the duty of the owner of the vessel is not a duty to provide a perfect or accident free vessel, but, instead, one of reasonable fitness. Also, the mere fact that seaman is injured in an accident on a vessel is not sufficient in and of itself to establish unseaworthiness and consequent liability. *Smith v. Flowers Transportation, Inc.*, 377 F.Supp. 1112 (N.D. Miss., 1974); *Clements v. Chotin Transp. Inc.*, 496 F.Supp. 163 (M.D. La., 1980); *Thornton v. Deep Sea Boats, Inc.*, 399 F.Supp. 933 (S.D. Ala., 1975). The burden of proof of unseaworthiness of a vessel or of Jones Act negligence falls upon the injured seaman; however, this burden has been characterized as very light. *Thornton, supra, Chisholm v. Sabine Towing & Transp. Co., Inc.*, 679 F.2d 60 (5th Cir., 1982).

The first allegation of unseaworthiness complained of by the plaintiff involved the defendant ordering plaintiff to perform a task alone that the plaintiff claims required at least two deckhands to perform in a reasonably safe manner. Much of plaintiff's proof involving this issue was addressed by Dr. Donald B. Chaffin, a Professor of Industrial and Operations Engineering and Director of the Occupational Health and Safety Engineering Program at

the University of Michigan. Dr. Chaffin's testimony concerned excessive compression forces resulting in disc-vertebrae failure; specifically analyzing the means of moving the cables utilized by the plaintiff on the day of his injury. This particular means was verified by the plaintiff at trial. As stated previously in the findings of fact, this means of movement required the lifting of some 90 plus pounds in front of plaintiff with arms parallel to the vessel's deck and then slinging the cables onto the adjoining barge. This movement required an unusually dangerous amount of pressure downward on plaintiff's back during the lifting stage and then the twisting of the plaintiff's back during the slinging stage. It was Dr. Chaffin's conclusion based on this means of moving the cables as well as the large number of "wires" to be moved, that this particular order by the Captain could only be accomplished in a reasonably safe manner by no less than two deckhands.

However, the Court is not convinced that the means of moving the cables utilized by the plaintiff on the day of his injury were the most reasonable and safest he could have selected. Dr. Chaffin's scientific evaluation and ultimate determinations only substantiate what common sense would tell the reasonable man; if you hold 90 plus pounds extended away from the body and then also attempt to sling this weight several feet onto an adjoining barge, there is a high possibility of physical injury; particularly in the lower back.

Dr. Chaffin's testimony convincingly shows that if an individual was to perform the task of moving cables as did the plaintiff in this cause of action that he could suffer serious injury; therefore, his conclusion was that the only safe means of moving these cables would require at least two deckhands. If only weight is considered, this appears to be the most prudent approach. However, the Court agrees with the testimony of several of the defense witnesses and does not believe that this particular task as well as many others required on a moving vessel is best accomplished by using two men. The physical design of a tugboat (*i.e.,* narrow passageways and restricted deck area), varying weather conditions and the actual movement of the vessel make many tasks impractical or impossible to be performed by two men. Industry usage or custom has provided an alternative for the task at issue in this action in which one deckhand stands the coiled wire upon its edge, places his arm and shoulder through the opening in the coil and carries it on his shoulder.

The Court notes and has considered the plaintiff's position that an unseaworthy practice does not become seaworthy on the basis that it is ratified by custom, usage or tradition within the industry. *Weeks, supra.* However, the Court cannot ignore the axiom that necessity is the mother of invention. A substantial amount of testimony was given by deckhands, pilots and captains from various vessels and companies that the acceptable manner of moving a coiled cable such as the ones in issue was by "shouldering" the cable or by dragging the cables in cases of short distances. Not one witness stated that the means utilized by the plaintiff at the time of his injury was acceptable. In fact, plaintiff testified that: (1) he had tugboat/barge experience both as a pilot and deckhand dating back to 1970, (2) he had been trained on-the-job to move cables in the "shouldering" manner and (3) he had never before used the means of moving cables that he used on the day of his accident.

Industry validation of the "shouldering" technique for moving cables is based on the considerations of the seaman's balance on a moving vessel, limitations of space and the ability to readily release the cable if necessity demands. Plaintiff contends that these considerations were not at issue in the case at bar. The Court does not agree. A seaman's balance on a moving vessel is always a consideration to be reckoned with. Even under perfect weather conditions, a vessel is subject to sudden movements that may affect the performance of a given task. The consideration of balance of the same task on land may be seriously diminished or not even an issue. The same is

true for the limitation of space. Finally, by the very nature and danger of employment on moving vessels, a seaman must be ready at all times to react to any emergency. The "shouldering" technique gives the seaman the ability to push the cables from his shoulder either to suddenly react to an emergency or to prevent the seaman from falling overboard.

In the case at bar, coordination of two men in the moving of cables such as the ones at issue would only enhance the possibility of further injury or accident. The two man technique does not diminish the fact that while pressure on the deckhand's back would be reduced, it still concentrates much of the effort and stress to be exerted by the deckhand in his lower back and arms. The benefit of leg strength as characterized in the "shouldering" method of transporting the cables is all but negated. The improvidence of the order given to plaintiff to individually move these cables will be further discussed and incorporated into the issue of unseaworthiness based on inadequacy of overall crew size.

■ The Court is in complete agreement with the plaintiff that an inadequate number of crew assigned to a vessel or an inadequate number of crew assigned to perform a given task is a classic example of unseaworthiness. See *Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967). In plaintiff's post-trial brief, plaintiff states that the issue of insufficiency of overall crew size was moot, because even if the A.W. Mulzer's crew was sufficient in overall size to prove seaworthy, the number assigned in the particular task of moving the cables was not. The Court will not belabor the issue of the insufficiency of overall crew size since plaintiff has more or less conceded it to be a moot point. However, after having heard the testimony on this issue and having reviewed the record, there appeared to be no question about the crew size being adequate and therefore seaworthy at the time of plaintiff's injury.

As stated in the findings of fact, the A.W. Mulzer was utilizing three deckhands during the voyage in which the plaintiff was injured. Two deckhands rotated six hour watches with the third deckhand on "call watch" or subject to being called out on duty as needed. From a practical standpoint, at least two deckhands were available for duty for any given watch. The decision to crew the A.W. Mulzer for this particular voyage with three deckhands as opposed to four was based on its route and service as evaluated by the defendant company and the Captain of the A.W. Mulzer. Expert testimony stated that: (1) the frequency of stops to pickup or drop off barges, (2) the number of barges in tow, (3) the distance of the voyage and (4) the number of locks to be executed were factors to be considered in crewing a tugboat.

■ Testimony given at trial indicated that this particular voyage of the A.W. Mulzer was considered "smooth trade" in the shipping industry because of the relatively small amount of work to be done during the voyage. Plaintiff did not show at trial how a four man crew with two deckhands on duty at all times would have been any more safe, efficient or effective than the system of the three man crew utilized by the A.W. Mulzer on this particular voyage and under these particular circumstances. Therefore, the Court finds that the overall crew of the A.W. Mulzer was adequate and seaworthy in reference to the voyage in question.

■ The issue as to whether the plaintiff should have been assigned individually to move the cables presents a more significant problem. Plaintiff would have the Court believe that he was assigned to move these cables with strict orders not to request any assistance. The Court has great difficulty accepting that proposition. Plaintiff's deposition and testimony at trial clearly indicates that he was aware that the "call watch" deckhand was available to assist plaintiff whenever needed. The Captain of the A.W. Mulzer testified at trial that he had not ordered the plaintiff to refrain from disturbing the call watch deckhand. The credibility of the evidence on this issue must be weighed in favor of

the defendant. It appears ludicrous to this Court that a company would hire and pay an employee, in this case the call watch deckhand, and then order him not to be disturbed. The A.W. Mulzer's log shows that either the call watch deckhand or another member of the crew was available during the after watch on the day of plaintiff's accident because during the early period of that watch the A.W. Mulzer and tow locked through the Racine locks. Regardless if the call watch deckhand or another crew member assisted plaintiff in "locking through" at Racine, the fact remains uncontroverted that plaintiff knew assistance was available if needed.

The Court finds *Skandalis v. M/V Galini, etc., et al.*, 1974 AMC 1671 (E.D. Va., 1974) informative as well as persuasive on the issue of the improvidence of ordering the plaintiff to move the cables alone. Plaintiff takes exception with this case because it was not reported in "the" Reporter System, but this Court cannot ignore the reasoning process performed in the disposition of that case.

As pointed out in Plaintiff's Reply to Defendants' Post-Trial Brief, the *Skandalis* case involved a Greek seaman on a Liberian vessel who allegedly injured his back from dragging a box weighing 100 pounds three feet. The plaintiff was ordered to move the box so that the weather bridge could be washed and painted. The box had to be lifted partially to avoid marring the deck. "Plaintiff testified that there was one seaman in the immediate vicinity whom he could have asked or ordered to help and that he could have summoned other seaman, but did not because he had moved the same box and lifted other heavy weights previously without difficulty." *Skandalis*, at p. 1673. Evidence indicated that the injured seaman had been previously diagnosed with back problems.

The *Skandalis* Court ruled that there was no basis for compensatory damages either on the theories of unseaworthiness or negligence. The Court stated at page 1675:

We do not think it an improvident order for the first mate of a vessel to order the second mate to perform some task without specifying the details of its performance, so long as that task is within the second mate's reasonably assumed ability and authority.

... If there was unseaworthiness, it would have to be predicated on the theory that insufficient men were provided for the task of moving the box. We have not so found, but, were that so, the failure would not be the first mate's for failing to detail the manner in which the second mate should perform his job, but the second mate's for failing to recognize the need for an additional man and using his authority to order one to help.

A footnote indicated that the injured seaman alone had the means of assessing his ability for doing heavy labor coupled with his own apparent belief in his fitness for duty. Critical to the findings in the *Skandalis* case as perceived by this Court was the fact that there was no evidence "that would support the contention that the box itself was not reasonably fit for its intended use, *including its removal by dragging to paint behind it.*" (Emphasis added) *Id.* at p. 1675. This fact is distinguishable from the case at bar and critical to the Court's analysis of this action.

Plaintiff contends that the defendant provided equipment aboard the A.W. Mulzer which was not reasonably safe for the use the defendant directed the plaintiff to make of it. The Court finds merit with this claim. Plaintiff complains that the "wires" were not safe for their intended use, *i.e.*, movement from the deck of the tow to the adjoining barge, because the "wires" had not been stripped of heavy shackles or cleavices. Evidence did not clearly establish the exact use for these shackles, but the Court surmises that they are used in securing the "wires" between the tow and the tugboat or the tow and the dock. Regardless of their exact use, evidence indicated that an indeterminate number of these shackles/chains were left connected to the two stacks of wires. Plaintiff's deposition (Question 665 p. 98) estab-

lished that these stacks of cables were on the A.W. Mulzer at the time he boarded the vessel. The defense did not question or controvert this finding either at the time of the plaintiff's deposition or at trial. Testimony was given that plaintiff was injured after moving approximately half of the "wires." The Court believes that it is a reasonably logical assumption because of the time of injury in relation to the number of cables moved to find that the shackles in question would have also been attached to the "wires" at the time the plaintiff boarded the vessel. This point will become more critical in the Court's Jones Act negligence analysis of the equipment to be discussed later.

Defendant states on page five of its Post-Trial Brief that testimony showed that the stowing of the coiled and stacked cables in the manner stowed aboard the A.W. Mulzer was a proper and seaworthy practice. The Court does not take exception to this statement. However, the stowing of the cables alone is not at issue in the case at bar but also the fact that additional hardware was connected to the cables at a time when the cables were ordered moved. Testimony was also given that these cables were only stowed with shackles attached when it was determined that the shackles were bent or stressed to such a degree that they could not be reasonably removed. Additional testimony given by the plaintiff indicated that these shackles might not be stripped from the wires until the end of a voyage. The reasonableness of the shackles remaining connected to the "wires" will be discussed later in the Jones Act negligence analysis.

It is not the Court's intention to "split hairs" or to impose undue or unfair requirements upon the shipping industry; however, where the warranty of seaworthiness has been breached by a vessel owner, the remedial and humanitarian policies of the warranty mandates that the vessel owner assume the responsibility. In *Baczor v. Atlantic Richfield Co.*, 424 F.Supp. 1370 (E.D. Penn., 1976) a vessel was found to be unseaworthy based on the "barest margin" of evidence. The vessel owner in

the *Baczor* case stowed cables on the deck of vessel in a coiled stack much in the same manner as the coils in the present action. A tarpaulin was placed over the cables to protect them from the natural elements. The "tarp" was weighed down by an unsecured shackle and hook. The injured seaman alleged that this stowing method was unseaworthy after the shackle slid off of the stack of cables on two different occasions and crushed his foot. The Court determined by the "barest margin" that the "stowage method was not reasonably fit to permit plaintiff, whose duties included handling of the tow lines, to perform his task aboard the tug with reasonable safety."

 This Court has emphasized the "barest margin" of evidence finding in the *Baczor* case to stress the very light, even featherweight, burden of proof that the plaintiff shoulders in an unseaworthiness claim. As stated in the *Baczor* case on page 1378:

> Focusing upon plaintiff's injuries, "the crucial consideration is whether the ship was, in all respects pertinent to the injury, reasonably fit to permit plaintiff to perform his task aboard the ship with reasonable safety." (cite omitted).

The Court therefore finds by the "barest margin" of evidence that the wires with shackles attached constituted an unseaworthy condition. Their propensity to "snag" or "catch" on other coils hindered the plaintiff from performing his task (moving the cables from the towboat to the barge) with reasonable safety and this unseaworthy condition was a proximate cause of the damage to the plaintiff.

### B. Jones Act Negligence

 The injured seaman must bear the burden of proving that negligence on the part of the vessel owner was a proximate cause of his injuries to recover for damages under the Jones Act; 46 U.S.C. § 688. *Thorton, supra.* As previously discussed in the Court's analysis of unseaworthiness, plaintiff's burden is very light. However, the mere fact that an injury occurred does

not give rise to a Jones Act claim. As stated in *Clements, supra,* "if an employer's negligence plays any part whatsoever in producing the injury, the employer is considered negligent under the Act." See also *Carlton v M/G Transport Services, Inc.,* 698 F.2d 846 (6th Cir., 1983).

The *Clements* case very ably defined negligence in reference to Jones Act claims as well as the shipowner's duty to employees working on vessel. The *Clements* Court stated on page 165:

> Negligence is the failure to exercise the degree of care which an ordinary prudent person would use under the circumstances in discharging the duty that he owes to those who work on a vessel. The shipowner has a continuing duty to provide a reasonably safe place to work and to use ordinary care to maintain the vessel in a reasonably safe condition.

As previously stated by the plaintiff, the claims for unseaworthiness and Jones Act Negligence have a tendency to overlap even though they are separate legal theories in and of themselves. The facts of the case provide the common denominator. This Court has determined that the order given to the plaintiff to move the cables individually as well as the overall crew size of the A.W. Mulzer during the voyage in question constituted seaworthy practices. In keeping with these findings and the standards set for determining Jones Act negligence as stated above, the Court finds that the defendant has no liability in relation to these two claims. The Court believes that the defendant used reasonable judgment in assigning the plaintiff the task as it did with provision for additional help if needed and that the three deckhands selected for the major part of the voyage in question were sufficient.

The facts that gave rise to the finding of unseaworthiness in regard to the stowing of the cables with shackles attached, also provides the basis for a finding of negligence pursuant to the Jones Act, 46 U.S.C. § 688. The Jones Act negligence involved in this claim precipitated the unseaworthy condition of the cables themselves.

The evidence shows that the cables or "wires" were stacked on the bow of the A.W. Mulzer when plaintiff boarded the vessel on or about August 7, 1980. Evidence indicates that these cables were used to replace other cables if they broke or became defective. Plaintiff did not claim and the Court did not find that these cables were unseaworthy for their normal use for binding tows. Nor does the plaintiff contend or did the Court find that the actual stacking of cables was unseaworthy. To the contrary, the caselaw and evidence established that this was quite an acceptable manner of stowing the cables. It was plaintiff's contention that the cables with attached shackles or cleavices were unsafe implements for the use the defendant directed the plaintiff to make of them. As with the issue of unseaworthiness regarding this equipment, the Court also finds negligence on the part of the defendant.

Plaintiff had been aboard the A.W. Mulzer for approximately seven days when he was injured. As pointed out by the defense at trial and in its Post-Trial Brief, this voyage by the A.W. Mulzer was classified as a "smooth trade" voyage because of the scant amount of work to be performed. This was one of the substantial factors in crewing the vessel with three deckhands as opposed to four. As stated on page two of defendant's Post-Trial Brief, the simple truth was there was "not much for deckhands to do" on this particular voyage of the A.W. Mulzer. "Indeed, the fact that the deckhands were painting the boat is proof enough that deck duties were extremely light on this trip." (Page two—defendant's Post-Trial Brief.)

By defendant's own admission, this voyage of the A.W. Mulzer was fairly uneventful and somewhat leisurely. Testimony at trial stated that it was common for stacked cables to get hung up occasionally as the deckhand tried to separate them. This common knowledge as to cables getting hung up, would seem to alert a vessel owner or his agent to inspect his equipment

to discern and correct conditions that may cause injury under reasonable standards. This duty to inspect would seem to fit under the *continuing* duty to provide a reasonably safe place to work. It would seem only reasonably and logically prudent for a vessel owner to inspect and remove any additional hindrances that make cables hang up when required to be moved.

Defendant had approximately seven days to inspect the two stacks of cables to evaluate the safest and best means of moving them. It would seem only reasonable where you have some 20 cables to be moved weighing approximately 90 pounds each, that any means that could be found to facilitate their movement would be utilized. Removal of the shackles or cleavices from the "wires" would have facilitated the "wires" movement.

The Court does not suggest that the shipping industry or individual vessel owner must immediately strip all shackles or other riggings from a "wire" when stacked and not in use. The reasonableness of the stowing of the "wire" must be evaluated on a case by case basis taking into consideration the totality of the circumstances. However, if numerous "wires" are to be moved as was the case at bar, then more precautions are necessary than were taken here. The defendant not only had seven days during the voyage to inspect the cables to devise the safest and most reasonable means of moving them; the evidence shows that the A.W. Mulzer departed on this voyage with said cables stacked in this manner. The Court believes that when the vessel was docked and not in service prior to this voyage, ample opportunity should have been provided to remove the additional shackles/cleavices from these "wires," or at least to double check to see if the "wires" were "catching" because of these cleavices. The Court will not venture into the quagmire of attempting to establish the minimum amount of time a vessel owner has in which to act, but has no trouble finding that the defendant under the present circumstances exceeded the acceptable maximum bounds. Therefore, the Court finds that defendant's liability in the case at bar is also predicated on a finding of negligence pursuant to the Jones Act and this negligence caused or contributed to the injury and subsequent damage sustained by the plaintiff.

## C. Contributory Negligence

Extensive citation is not required for discussion of this issue. Defendant alleges that plaintiff was totally liable for his own injuries, or in the alternative, contributorily negligent. Based on the findings above, defendant's only basis for shifting liability is the affirmative defense of contributory negligence. The burden of establishing the affirmative defense of contributory negligence is on the vessel owner. If contributory negligence is established by the vessel owner, it will not operate as a complete bar to the injured seaman's recovery, but result in an allocation of fault on a comparative basis. *Tolar v. Kinsman Marine Transit Co.*, 618 F.2d 1193 (6th Cir., 1980); *Hall v. American S.S. Co.*, 688 F.2d 1062 (6th Cir., 1982); *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939).

The *Tolar* case provided a basis for the distinction between assumption of risk and contributory negligence in the maritime setting in the Sixth Circuit. The *Tolar* opinion stated at pages 1195, 1196:

A seaman may not be denied recovery because he proceeds in an unsafe area of the ship or uses an unsafe appliance in absence of a showing that there was a safe alternative available to him ... To determine whether plaintiff was guilty of contributory negligence we must focus on his actions after he assumed the risk of working with the defective rig since the defense of contributory negligence requires evidence of some negligent act or omission by the plaintiff other than his knowledgeable acceptance of a dangerous condition.

The Court deems it appropriate at this juncture to reflect on the seaman's duty to protect himself aboard a vessel. A seaman has a duty to use reasonable care

even though this duty is slight. This duty is further tempered by the realities of maritime employment. Generally, a seaman has no duty to find the safest way to perform a given task because this responsibility lies primarily with the vessel owner. *CEJA v. Mike Hooks, Inc.*, 690 F.2d 1191 (5th Cir., 1982).

As stated above, the Court finds the reasoning process utilized in the *Skandalis* case is both informative and persuasive. The *Skandalis* case mirrors the factual setting of the case at bar save the issue of equipment not being reasonably fit for its intended use. The *Skandalis* Court refused recovery for the seaman because of the absence of that issue; the presence of that issue in the case at bar will provide for recovery for the plaintiff tempered by his own contributory negligence.

■ The evidence in the case at bar has established liability on defendant's part based on both unseaworthiness and Jones Act negligence. The actual causation will be evaluated further under the Court's damage analysis. The Court does not feel that the defendant was completely at fault for the injuries complained of by the plaintiff, and believes that the plaintiff must bear his proportionate share of the responsibility. As *Tolar, supra,* requires, the Court must focus on the injured seaman's actions after assuming the risk of working with the defective equipment. It is imperative that there is evidence of some negligent act or omission by the seaman other than his knowledgeable acceptance of a dangerous condition.

■ The Court will numerically set forth the factors it considered in allotting fault on a comparative basis.

1. The amount of time to evaluate the task to be performed is a two-edged sword. The evidence indicated that plaintiff had sufficient, even a leisurely, amount of time to evaluate the difficulty of his task and had authority to request help if needed (*i.e.,* "call watch" deckhand).

2. Evidence indicated that plaintiff had injured his back in 1976 and therefore, was in the best position to assess his ability for doing heavy work coupled with his own apparent belief in his fitness for duty.

3. Evidence showed that plaintiff had extensive experience and background on the river dating back to 1970. Plaintiff's experience was as a pilot as well as a deckhand.

4. Evidence indicated that plaintiff was aware of the proper method of carrying a coiled "wire" on a vessel. Plaintiff learned the "shoulder" technique of carrying a coiled "wire" through on-the-job training when he first began working as a deckhand.

5. Evidence indicated that plaintiff had previously moved cables similar to the ones he was moving on the day of his injury.

6. Evidence indicated that plaintiff had never used the particular method of moving cables utilized at the time of his accident. Uncontroverted evidence indicated that plaintiff had admitted to getting in a hurry when performing the assigned task.

7. Finally, while plaintiff had only a slight duty to protect himself, plaintiff was still required to use reasonable care. Plaintiff was precluded from ignoring the obvious.

Based on the above findings and the determination that a safe alternative was available to plaintiff after assuming the risk of working with unsafe equipment, the Court apportions liability on the following basis:

Richard D. Burden (Plaintiff): 80%

Evansville Materials, Inc. (Defendant): 20%

### D. Damages

Given the fact that this action involves maritime/admiralty law and the very slight burden of proof borne by an injured seaman; liability has been proven by Richard Burden against Evansville Materials, Inc. In a different respect and in keeping with *Tolar, Hall* and *Socony, supra,* Evansville Materials, Inc. has proven that Mr. Burden was contributorily negligent in the causation of his own injuries. Taking these

factors into consideration, the Court must now fashion a remedy that reflects these considerations.

The Court has spent an extensive amount of time reviewing plaintiff's medical records, pleadings filed by counsel and testimony given at trial in computing the damages in this case. In determining the damages suffered by the plaintiff, the Court considered the following factors:

1. Was the plaintiff totally and permanently disabled in both a medical and vocational sense?

2. Were plaintiff's damages totally caused by the defendant's negligence and/or unseaworthiness of his vessel?

3. How best could the Court compute damages to make this task an analytical rather than an intuitive undertaking?

4. Could the damages complained of be proven by objective evidence or were they grounded in subjective opinion?

1. *Was the plaintiff totally and permanently disabled in both a medical and vocational sense?*

The most highly contested issue involving damages in this action is whether the plaintiff is totally and permanently disabled in a medical and vocational sense. Obviously this issue is of extreme importance in the computation of pre-trial loss of wages and post-trial impairment of earning capacity. As to be expected, plaintiff would have the Court believe that he is devastated and cannot perform even the most basic work. On the other hand, the defendant would have the Court believe that the plaintiff has been minimally impaired through his own fault and that jobs are plentiful for a man in his condition. The Court believes that the truth lies somewhere in between.

■ Plaintiff alleged in his pleadings and at trial that the medical evidence proved conclusively that he was totally physically impaired and that the extent of his physical impairment resulted in his total occupational disability. Plaintiff states that the standard for determining total disability is whether an injured party can reasonably be expected to find employment in

his injured condition. *Baker v. Baltimore & Ohio Railroad Company,* 502 F.2d 638 (6th Cir., 1974); *O'Shea v. Riverway Towing Co.,* 677 F.2d 1194 (7th Cir., 1982). The Court recognizes this standard as limited by the *O'Shea* and *Baker* cases. The *O'Shea* court in addressing the issue of total disability stated at page 1197:

> The question is not whether Mrs. O'Shea is totally disabled in the sense, relevant to social security disability cases but not tort cases, that there is no job in the American economy for which she is medically fit. (cites omitted). *It is whether she can by reasonable diligence find gainful employment, given the physical condition in which the accident left her.* (Emphasis added.)

The standard for determining total disability used in the *O'Shea* case was based on reasoning from the Sixth Circuit *Baker* case. This case involved an injury sustained by a railroad worker which falls under the standards and purview of the Federal Employer's Liability Act. As stated by the plaintiff, FELA standards are applicable in Jones Act cases. The standards utilized by the *Baker* court in assessing future wages lost were stated at page 644:

> ... we start from the proposition that Appellee (injured railroad worker) was entitled to recover for any loss of earning power suffered because of Appellant's (railroad) negligence. *In assessing damages proximately caused by Appellant's negligence, the jury was to consider whether Appellee exercised reasonable efforts to secure gainful employment.* (emphasis added) If Appellee failed to do so, the loss of wages is said to be Appellee's choice rather than a proximate result of Appellant's negligence.

■ Based on the medical and vocational evidence presented at trial, the Court is in agreement that the plaintiff is totally disabled to perform the duties of either a deckhand or a pilot. This finding is premised on the extensive medical evidence involving the treatment of plaintiff's back

injury. The medical, and vocational evidence unequivocally established that plaintiff was unable to sit, stand, climb, balance or stoop for extended periods of time. Also, he would be unable to do heavy lifting. A deckhand or pilot position would require varying degrees of all of these physical attributes. The Court believes that the plaintiff is permanently precluded from working as a deckhand and/or a pilot, but the Court does not believe that the plaintiff is totally and permanently disabled in a complete vocational and medical sense in relation to other jobs in the American work environment.

The Court's determination that the plaintiff is not barred from working other jobs in the competitive work market is significantly based on the testimony of Mr. Robert B. Ancell and Dr. Anthony M. Gamboa. These witnesses established a common ground in reference to job classifications and the requirements needed to perform at various occupational levels. The Dictionary of Occupational Titles (DOT) as published by the United States Department of Labor provides that common ground. The DOT established 12,099 different job titles which are defined in terms of skills, vocational preparation and physical capacity to perform various tasks. The DOT's breakdown of physical capacity to perform various types of work are as follows:

1. Sedentary work—usually requires sitting six of eight hours a day and lifting no more than ten pounds;

2. Light work—usually requires standing six of eight hours a day and lifting no more than twenty pounds;

3. Medium work—usually requires standing six of eight hours a day and lifting no more than twenty-five pounds;

4. Heavy work—usually requires standing six of eight hours a day and lifting no more than fifty pounds; and

5. Very Heavy work—usually requires standing six of eight hours a day and lifting no more than one hundred pounds.

It was Mr. Ancell's testimony that 95% of all injured workers eventually return to work. Mr. Ancell's original opinion in 1983 was that the plaintiff had a 20% chance of success for securing and keeping a job from the 5% of extremely injured persons who had been off work for an extended period of time. Mr. Ancell's 1983 opinion was revised based on Dr. Thomas Szymke's subsequent evaluation of the plaintiff. Mr. Ancell testified at time of trial that there was no job title in the DOT that plaintiff could perform based on Dr. Szymke's findings.

Dr. Gamboa's analysis of plaintiff's vocational potential also utilized the DOT as cross-referenced to actual census data in the Nashville labor market. Dr. Gamboa's analysis assumed: (1) Plaintiff could perform sedentary and/or light work, (2) plaintiff was unable to bend, stoop, crawl, climb or balance, and (3) any work to be performed by plaintiff had to be unskilled to marginally semi-skilled work. Based upon the 1980 census for the Nashville metropolitan area, Dr. Gamboa established that there were 395,579 employed workers in the local labor market. Dr. Gamboa determined that plaintiff had the capacity to perform 14.13% of the jobs in the local labor market or 55,888 different jobs with a median yearly income of $13,451.88. Dr. Gamboa's findings were based on the hypothetical assumptions stated above. Some of the jobs that Dr. Gamboa believed the plaintiff could perform within the stated restrictions were as an assembler, inspector, photographer, fork-lift operator, cashier and light delivery work.

At trial, plaintiff took exception with Dr. Gamboa's analysis because his predictions only took into account the capacity of plaintiff to perform certain jobs without considering plaintiff's self-defined limitations as well as his over-all employability. After including these factors, which would restrict plaintiff to sedentary work in which he could alternatively sit and stand, and light work which would permit plaintiff to sit for a majority of the work day, Dr. Gamboa revised his original 14.13% figure of available jobs the plaintiff could perform to a minimum of 2% and a maximum of 7%.

Plaintiff established that these jobs were of the type that a great percentage of the population would be able to perform and that they reflected the local market in Nashville, Tennessee, and not Bowling Green, Kentucky, where he currently resides.

Mr. Ancell's original opinion was that plaintiff had a 20% chance of securing and keeping a job. This opinion was changed primarily on the basis of Dr. Szymke's diagnosis and prognosis. As pointed out by the defendant, Dr. Szymke's over-all opinion of plaintiff's medical and vocational condition was not in total agreement with other members of his staff. Much of the disagreement centered around plaintiff's self-defined limitations in relationship to the continuing nature of his pain. Dr. Szymke's findings differ in varying degrees from that of his radiologist (Szymke Depo. p. 68), his nurses (Szymke Depo. p. 71) and his staff psychologist (Szymke Depo. p. 80). While differences of opinion are not uncommon when different physicians evaluate the same patient, the Court must question the almost pessimistic view of Dr. Szymke in relation to the opinions of other staff members at his clinic. The range of activities that plaintiff is able to perform according to Dr. Szymke (Szymke Dep. 46) would seem likely to conform to even the more conservative range of available positions that Dr. Gamboa established. Dr. Davis and Dr. Szymke's own physical therapy department believe that the plaintiff is a candidate for comprehensive rehabilitation and/or a work hardening program.

2. *Were plaintiff's damages totally caused by the defendant's negligence and/or unseaworthiness of his vessel?*

As pointed out by the plaintiff, the capacity to perform a given job does not necessarily reflect the individual's actual employability. The Court cannot take exception to this statement. However, plaintiff's employability in the case at bar is not solely a function of factors beyond his control, or caused by the defendant. There is no disputing the fact that the plaintiff has sustained serious injury. That fact in and of itself makes the plaintiff unattractive to many employers. As emphasized by the plaintiff, many of the positions that he is qualified to perform fall into the general category that many healthy unskilled or marginally skilled unemployed persons are also seeking. Plaintiff's unattractiveness to employers is also a result of his lack of tangible skills, his limited formal education and a past work history of thirteen jobs in thirteen years. The defendant cannot be blamed for these shortcomings. This Court must decide how much of plaintiff's unemployability is a result of defendant's liability and how much of it is caused by plaintiff's own fault and the realities of the times.

Defendant stated that it should only be held responsible for the damage, if any, that it caused plaintiff to suffer. The Sixth Circuit *Baker* opinion reinforces this idea. The permanency of plaintiff's injuries must be weighed against his reasonable diligence or the efforts he used in attempting to secure gainful employment. As stated in the *Baker* case, if the plaintiff fails to use reasonable efforts in securing gainful employment, the loss of wages is said to be the plaintiff's choice rather than a proximate result of defendant's negligence. At the time of trial, the evidence showed that plaintiff had made no effort whatsoever to secure gainful employment since the time of his accident. Reasonable diligence is not even an issue in the case at bar; therefore, plaintiff must be held responsible for his own refusal to attempt to find suitable employment. Plaintiff's refusal to attempt to utilize reasonable diligence in securing gainful employment will be reflected in an offset against his loss of earnings. In regard to the causation issue the Court has considered the plaintiff's past medical and work history as well as the potential for injury after the hunting trip and sneezing episode in its computation of damages.

The Court shares the defendant's concern that it should not be held liable for damages that it was not responsible for

causing, especially pre-existing conditions. This issue was discussed in *Milos v. Sea-Land Serv., Inc.*, 478 F.Supp. 1019 (S.D. N.Y., 1979), *affirmed*, 622 F.2d 574 (2nd Cir., 1980), *cert. denied*, 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 219 (1980). In *Milos* the plaintiff slipped on a vessel injuring the right side of plaintiff's body. This injury aggravated a pre-existing arthritic condition. The *Milos* court stated the general law involving this issue on page 1023:

> The law is clear that when a defendant's wrongful act or omission aggravates or accelerates a plaintiff's pre-existing condition and disables a plaintiff, thus rendering him unable to continue his work, or said aggravation awakens a dormant condition that causes a plaintiff to experience pain although he had suffered no pain from the condition prior to the aggravation, such defendant is liable in full for the disability and/or pain it caused. Here, the same standard is employed as in every other seaman's injury case: a defendant is liable if, and only if, its breach of duty "played any part, even the slightest" in producing the injury for which damages are sought.

The *Milos* Court further stated that if a vessel owner's act merely advanced a disability that would have occurred in any event, the vessel owner would be held liable in damages only for such advancement of the disability caused by it.

In the case at bar, evidence was presented that plaintiff had a previous back injury in 1976. Additional testimony by Dr. Davis showed that plaintiff suffered from degenerative disc disease. Testimony given by the plaintiff indicated he was in good health immediately before his accident aboard the A.W. Mulzer; while testimony given by "Buck" Roberts indicates something entirely different. The weight and credibility of this evidence is for the Court to consider in determining whether the defendant aggravated a pre-existing condition or merely advanced a disability that would have occurred in any event. This consideration will be reflected in the Court's damage computation.

The Court has discussed at length the evidence it has considered in determining that the plaintiff is permanently precluded from working as a deckhand and/or harbor pilot. The Court has also determined from the evidence that plaintiff can do some type of sedentary/light work and that the plaintiff has not made reasonable efforts to secure gainful employment. The computation of pre-trial loss of wages and post-trial impairment of earning capacity is based on these considerations.

*3. How best could the Court compute damages to make this task an analytical rather than an intuitive undertaking?*

The only evidence presented as to the loss of wages and impairment of earning capacity was introduced by plaintiff's economist, Dr. Robert Pulsinelli. The defendant did not choose to use his own expert in this field to controvert Dr. Pulsinelli's testimony. The defendant did not contest Dr. Pulsinelli's formula for calculating these particular damages, but has taken exception to various values allotted to factors in the formula used.

This Court will not attempt to analyze all of Dr. Pulsinelli's computations, but instead address the objections that defendant has made in the computation of the pre-trial loss of wages and post-trial impairment of earning capacity. The Court, after reviewing Dr. Pulsinelli's testimony and computations, is firmly convinced that his predictions involving these specific damages are well within the mandates contained in *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). A simplistic statement of the formula utilized by Dr. Pulsinelli in computing plaintiff's damages involved a base earning figure (i.e., worker's annual wages at time of injury), the work life expectancy of the injured worker and income adjustments (i.e., Social Security, Federal and States taxes, inflation factor). An adjusted real income derived from the above factors was reduced to present value by utilization of a real after tax discount rate. The real after tax discount rate was derived from the following three factors: (1) current market

or nominal short-term United States Treasury Bill Rate; (2) 1985 inflation rate; and (3) the after-tax interest earnings which fluctuates with the tax rate based on income level. The rationale and findings of the *Pfeifer* case were cited by the Sixth Circuit in *Kokesh v. American S.S. Co.*, 747 F.2d 1092 (6th Cir., 1984).

The defendant did not controvert Dr. Pulsinelli's formula but has taken exception with the assumed occupation of the plaintiff, the projected income based on the assumed occupation and plaintiff's work life expectancy. Defendant's computation of plaintiff's loss in income is based on the simple formula of $A - B = C$. "A" reflects plaintiff's pre-injury income; "B" reflects plaintiff's post injury income and "C" finally reflects the net difference in income.

The defendant took exception to Dr. Pulsinelli assuming that the plaintiff would work as a harbor pilot for his remaining work life; that the projected income from this assumed occupation was based on the highest earnings of the plaintiff during a seven year period and that the work life expectancy of the plaintiff was based on 30.6 years as opposed to 28.75 years.

■ While the Court is fully aware of plaintiff's past work history, plaintiff's relatively short work history as a harbor boat pilot and the depressed nature of the shipping industry, the Court believes that the record safely supports the assumption that plaintiff could or should work as a harbor pilot in the future. Defendant's point that plaintiff had also worked as a farm hand, factory laborer or even a used-car salesman is well taken by the Court; however, the evidence that the plaintiff was a qualified, licensed harbor pilot and had an established work record of over two years as such supports this assumed occupation as a harbor pilot.

■ Defendant contends that utilizing the plaintiff's highest income over a seven year period is error and that the reduced mean or median income over these same seven years would be more realistic and equitable. While this argument has merit,

the Court does not believe that using a mean or median figure would reflect the potential income that could be earned as a harbor boat pilot over an extended period. While the 1978 figure used by Dr. Pulsinelli is in fact the highest yearly earnings of the plaintiff over a seven year period, it can be specifically verified by plaintiff's income tax forms and is directly related to work as a harbor boat pilot. In reference to lost earning capacity computations for plaintiffs in the *O'Shea* and *Kokesh* cases, the case at bar has a much more substantial foundation for its computations with far less speculation.

■ Finally, defendant believes that a work life expectancy of 28.75 years would be more appropriate to use as opposed to the 30.6 years used by Dr. Pulsinelli. This contention was based on the fact that plaintiff voluntarily left the labor force twice before his thirtieth birthday and according to U.S. Department of Labor statistics, a worker will average leaving the labor force only 2.7 times during his entire work life. Dr. Pulsinelli testified that it was not unusual for workers under the age of thirty to change positions in trying to find a more appropriate or desirable position. Dr. Pulsinelli did not believe that plaintiff's voluntary withdrawal from the labor force warranted a reduction in his work life expectancy. This belief was not controverted by the defendant. As to pre-injury income predictions based on defendant's formula, the Court believes that a foundation was established to support Dr. Pulsinelli's assumptions; however, plaintiff's sporadic thirteen year work history as well as the realistic possibilities of actually securing and maintaining a full-time harbor boat pilot position in a depressed shipping economy must be considerations weighed in the over-all damage computation.

■ The defendant's post-injury income theory provides a credible argument for the Court's consideration; especially in light of the Court's determination that the plaintiff could perform some sedentary or light work. Dr. Pulsinelli assumed that plaintiff would have no post-injury income

based on information supplied to him by the plaintiff and assuming that plaintiff was permanently precluded from doing any type of work. Defendant contends that plaintiff could perform jobs making at least minimum wage and probably more. Based on Dr. Gamboa's testimony, defendant contends that there were jobs that plaintiff could do with a median yearly salary of $13,451.88 in the Nashville job market. Taking into account various factors previously discussed in this opinion, the Court does not believe that it is a realistic possibility that the plaintiff could secure a job in this salary range. However, based on the finding that plaintiff could do some sedentary or light work, the Court finds merit with defendant's argument that plaintiff could find a minimum wage position. The medical and vocational proof supports this finding. Also, plaintiff has made no effort to secure any type of work since the time of his accident; therefore, he is responsible for his loss of wages under the *Baker* Court's rationale.

Dr. Pulsinelli's computation in April, 1985, using the above-stated formula, yielded a pre-trial loss of wages of $78,565.00 and a post-trial impairment of earning capacity of $324,889.00 for a total loss of earnings of $403,454.00 for the plaintiff from the time of his accident. This figure represented a sum reduced to present value based on a real after tax discount rate of 4.09%. At the time of trial, the plaintiff had Dr. Pulsinelli revise this figure because of a fluctuation in the short-term U.S. Treasury Bill Rate. The Treasury Bill rate had dropped from 9.7% in April, 1985 to 7.2% in September, 1985, resulting in a real after tax discount rate of 2.29%. This drop in the discount rate caused the post-trial impairment of earning capacity figure to increase from $324,889.00 to $395,484.00 with a total earnings loss of $474,049.00. The defendant has contested this increase and described it as speculative. The Court adopts this increase based on the previous use of the formula by Dr. Pulsinelli and his testimony as an expert in this field. The defendant did not present expert testimony to controvert Dr. Pulsinelli; therefore, "the

weight to be accorded unimpeached expert opinion evidence is solely for the judge sitting without a jury." *Eason v. Weaver*, 484 F.2d 459 (5th Cir., 1973).

The Court has adopted the total loss of earnings figure of $474,049.00 for computation purposes only. As previously stated, this figure will be reduced by an amount reflecting projected hypothetical earnings at the minimum wage as well as factors such as plaintiff's checkered work history and the depressed shipping industry. Dr. Pulsinelli computed a post-injury income based on the minimum wage in April, 1985 of $93,549.00. This figure was reduced to present value based on an after-tax discount rate of 4.99%. Evidence was not introduced by the defendant to show how the fluctutation in the U.S. Treasury Bill Rate would affect the over-all minimum wage computation. Logic and common sense indicates that if this fluctutation resulted in an increase in the post-trial impairment of earning capacity figure, it should also affect the minimum wage computation in the same way. Unfortunately, Dr. Pulsinelli was not asked to revise this figure. The Court believes to raise the impairment of earning capacity figure but not the minimum wage figure, would yield an unjust and inequitable result for the defendant. However, the Court cannot speculate as to this amount or pull a number from thin air. The Court does not have the necessary information to compute a figure based on this change in the U.S. Treasury Bill Rate. However, the Court believes an equitable alternative does exist. The change in the impairment of earning capacity figure resulted in an approximate 18% increase. An equivalent percentage change in the minimum wage figure would yield an increase of approximately $17,000.00. While this estimation does not exactly reflect the increase in the minimum wage figure that would have resulted in utilizing the formula, it is the best good faith approach that the Court had at its disposal to equitably protect the defendant's interest without endangering the plaintiff's interest based on speculation.

This $17,000.00 increase results in a post-injury income computation of $110,549.00.

The Court therefore finds that the plaintiff's pre-trial loss of wages and post-trial impairment of earning capacity totals $474,049.00. This amount is reduced by $110,549.00, which reflects an amount that the plaintiff could earn working minimum wage positions. (This amount is further reduced by $25,000.00 based on consideration of intangible factors previously discussed in this opinion.) Therefore, plaintiff's pre-trial loss of wages and post-trial impairment of earning capacity totals $338,500.00, which will be proportionately reduced in the Court's judgment to reflect plaintiff's liability based on his contributory negligence.

4. *Could the damages complained of be proven by objective evidence or were they grounded in subjective opinion?*

 The Court will not belabor its analysis of the plaintiff's physical pain, mental anguish and loss of enjoyment of life, both past and future. Plaintiff cites to *Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475 (5th Cir., 1984), in which the injured seaman received a judgment that included $500,000.00 for pain and suffering. While this Court does not dispute that there are instances where a recovery of this size is justified for pain and suffering, such is not the case in the instant action. The Court can take little instruction on this issue from other cases, but must apply the facts as presented at trial to its own common sense, observations and experience. Testimony given at trial portrayed the plaintiff as a healthy young man who enjoyed an active sports life prior to August, 1980. Subsequent to August, 1980, the plaintiff has been subjected to numerous physicians performing multiple surgical techniques in an attempt to correct a serious back disorder. It cannot be contested that the plaintiff has had to endure both mental anguish and physical pain during the treatment of this most serious condition.

The extreme, continuing pain that the plaintiff complains of is somewhat at odds with certain evidence presented at trial. Testimony given by Drs. Tapp, Davis, Fischer and Watkins somewhat contradicts the subjective complaints of pain made by the plaintiff. It is important to note that this testimony covers a period of time beginning in September, 1980 and ends several days before trial. While the Court is aware that subjective pain is not always manifested in medically observable or detectable symptoms, the Court cannot ignore these contradictions.

The Court believes that many of the plaintiff's complaints of pain are a product of depression created by his inactivity over a five year period of time. This theory is supported by Dr. Davis's March 29, 1983, deposition. This theory is further supported by plaintiff's own testimony that by the mere exposure to Dr. Szymke's Rehabilitation Institute, he suffered less physical discomfort, his alcohol abuse ceased, his medication was reduced and his over-all mental attitude improved.

Finally, the Court's observations of the plaintiff over the four day trial do not support a claim of continuing, untreatable pain. The Court believes that plaintiff has suffered pain in the past and will be subjected to varying degrees of pain in the future; however, increased mental and physical activity based on the various doctor's testimony, plaintiff's own testimony and the Court's observations appears to be the recommended treatment in alleviating the plaintiff's persistent complaint of pain. Based on these findings, the Court awards $80,000.00 for plaintiff's physical pain, mental anguish and loss of enjoyment of life, both past and future. This award is subject to reduction in the Court's judgment reflecting plaintiff's liability based on his contributory negligence.

 Mrs. Mabel Burden, wife of Richard Burden and co-plaintiff, joined this action demanding damages for past and future loss of Richard Burden's society. Mrs. Burden, the spouse of an injured crew member who survived his injury, is entitled to recover her loss of society in an action

for unseaworthiness because such action is based on general maritime law. *Madore, supra.* As defined in *Sea-Land Services, Inc. v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), "the term 'society' embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort and protection." Mrs. Burden's uncontroverted testimony, compared the plaintiff's outgoing, fun-loving, caring personality prior to the August, 1980, accident with the withdrawn, moody, depressed, individual he became afterwards. She testified that the plaintiff's personality was affected by the intake of alcohol and medication. The Court finds that the injuries suffered by the plaintiff have directly affected the relationship he once had with his wife. As pointed out by the Court in analyzing the plaintiff's pain and suffering, plaintiff's inactivity is also a factor that must be considered when evaluating Mrs. Burden's loss of society. Evansville Materials, Inc. must be held responsible for its part in the loss of Mrs. Burden's society; however, again the plaintiff's motivational level and desire to actively participate in society must temper his recovery. Based on these findings, the Court awards $20,-000.00 to Mrs. Burden for the loss of her husband's society which is subject to reduction based on a finding of plaintiff's contributory negligence.

■ Plaintiff has also claimed damages for maintenance and cure. Maintenance is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service. Likewise, cure is care, including nursing and medical attention, that the seaman is additionally entitled to under the same circumstances. The duty of a vessel and her owner to provide maintenance and cure to an injured or sick seaman "extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." Recovery for maintenance and cure is available to any seaman who becomes ill or injured while in the service of his ship and not even the

seaman's own negligence will bar recovery. *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *Aguilar v. Standard Oil Co.,* 318 U.S. 724, 63 S.Ct. 930, 87 L.Ed. 1107; *Calmar S.S. Corporation v. Taylor,* 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993 (1938); *Fitzgerald v. United States Lines Company,* 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963); *Solet v. M/V Capt. H.V. Dufrene,* 303 F.Supp. 980 (E.D.La., 1969); *Cox v. Dravo Corporation,* 517 F.2d 620 (3rd Cir., 1975); *Atkins v. Crounse Corporation,* 196 F.Supp. 904 (W.D.Ky., 1961).

The plaintiff is clearly entitled to recover damages for maintenance and cure; the only issues existing are (1) the daily amount allowable in reference to the maintenance and (2) when maximum medical recovery was reached. Plaintiff has claimed damages for maintenance in the amount of $21,950.00. This amount was based on an allowance of $25.00 per day from the date of injury through December, 1982, when plaintiff claims he reached maximum medical recovery. Plaintiff's maximum recovery date was based on Dr. Davis's testimony as contained in his deposition (3/29/83, p. 18). This period of time encompassed 878 days.

■ The defendant has objected to plaintiff's determination of maximum recovery. Defendant contends that the plaintiff was recovering under conservative medical treatment and would have returned to work soon after the August, 1980 accident except for the additional injury plaintiff allegedly suffered while hunting in September, 1980. Defendant contends that the additional care and surgery required in the treatment of the plaintiff were strictly the result of plaintiff ignoring his doctor's advice. While this argument is attractive to the Court, the evidence at trial showed that the plaintiff did nothing to further aggravate his back injury while hunting. The defendant did not controvert this evidence. As stated in *Vaughan, supra,* 369 U.S. at 531, 82 S.Ct. at 999, admiralty courts have been liberal in interpreting the

duty to provide maintenance and cure, and where there are ambiguities or doubts, they are resolved in favor of the seaman.

■ Evidence was established at trial that food and lodging in the vicinity of Bowling Green, Kentucky, would cost approximately $28.00 per day. This evidence was introduced through testimony given by Mrs. Burden. While the Court recognizes the fact that evidence of actual expenditures would have been more desirable and probative than Mrs. Burden's testimony, this evidence is clearly admissible. See *Morel v. Sabine Towing & Transp. Co., Inc.*, 669 F.2d 345 (5th Cir., 1982).

Based on the above findings, plaintiff's claim for maintenance in the amount of $21,950.00 is adopted. The parties have stipulated that the defendant has paid the plaintiff $8,100.00 in worker's compensation benefits and is entitled to a credit of that amount on the maintenance claim. This leaves a total amount due of $13,850.00 on plaintiff's maintenance claim.

Plaintiff's claim for cure has a considerable overlap with damages claimed for unreimbursed medical expenses previously incurred and future medical expenses to be paid. The characterization of various medical expenses as applying to plaintiff's cure as opposed to medical expenses recoverable because of defendant's negligence have a significant affect on the computation of the over-all medical claim. As stated in *Fitzgerald, supra*, 83 S.Ct. at p. 1649:

> ... all lost earnings and medical expenses are recoverable on a negligence count, but under the Jones Act they are subject to reduction by the jury if the seaman has been contributorily negligent. These same items are recoverable in part on the maintenance and cure count, but the damages are measured by different standards and are not subject to reduction for any contributory negligence.

As previously stated, the duty of the vessel owner to provide maintenance and cure to an injured seaman extends only during the period when the seaman is incapacitated to do a seaman's work and continues until he reached maximum medical recovery. In reference to the vessel owner's duty to provide maintenance and cure, the *Dravo Corporation* court stated at p. 623:

> ... although the obligation to provide maintenance and cure is separate from any duty of indemnification or compensation for employment-related injuries, it is clearly not an open-ended duty to provide food, lodging and medical care for the total duration of every illness or injury incurred while in the service of the vessel.

■ As claimed by the plaintiff and as determined by the Court, the plaintiff's maximum medical recovery occurred as of December, 1982. The Court has scrutinized the medical bills as contained in plaintiff's Exhibit No. 6 to determine what expenses can be characterized as part of plaintiff's cure; therefore, not being subject to reduction as a result of plaintiff's contributory negligence. Any doubts or ambiguities as to how a particular expense should be classified was resolved in favor of the plaintiff. After reviewing all medical bills contained in plaintiff's Exhibit No. 6 and considering these bills in reference to the maximum recovery date of December, 1982, the Court has determined that $26,111.06 of the total amount of unreimbursed medical expenses previously incurred are to be treated as cure. This amount is not subject to reduction based on plaintiff's contributory negligence. A remaining amount of $11,989.30 reflected damages incurred after December, 1982; therefore, these bills cannot and will not be treated as part of plaintiff's cure. This amount is subject to reduction based on plaintiff's contributory negligence.

■ Finally, the plaintiff has introduced evidence that he anticipates future monthly medical expenses in the amount of $67.00. This expense is reflected in payments of $37.00 per month for medication and $30.00 per month for chiropractic services. Based on plaintiff's remaining life expectancy of 38.5 years, plaintiff's future medical expenses will total $30,954.00.

This need for additional medication and required chiropractic services will occur at a time subsequent to plaintiff's maximum medical recovery; therefore, these expenses clearly cannot be classified as part of plaintiff's cure. Based on the *Dravo Corporation* and *Fitzgerald* cases, plaintiff's claim for future medical expenses must be classified as compensatory damages caused by the defendant's negligence which is subject to reduction based on plaintiff's contributory negligence. As stipulated by the parties, the defendant has paid $27,981.38 in medical costs; therefore, the defendant will be entitled to a credit in that amount against the final medical cost computation.

## JUDGMENT

For the reasons set forth in the Memorandum filed this date, IT IS ORDERED, ADJUDGED AND DECREED that the plaintiff, Richard D. Burden, recover of the defendant, Evansville Materials, Inc., the sum of $104,268.34, with interest thereon at the rate of ——% per annum until satisfied. This amount represents the plaintiff's compensation for pre-trial loss of wages and post-trial impairment of earning capacity; physical pain, mental anguish and loss of employment of life, past and future; unreimbursed medical expenses previously incurred and future medical expenses and maintenance and cure. Excluding maintenance and cure, this amount reflects a 80% reduction of the original recovery based on a determination by this Court that the plaintiff, Richard D. Burden was contributorily negligent in the causation of his own injuries which requires an allocation of fault on a comparative basis.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that the plaintiff, Mabel C. Burden, recover of the defendant, Evansville Materials, Inc., the sum of $4,000.00, with interest thereon at the rate of ——% per annum until satisfied. This amount represents the plaintiff's compensation for the loss of Richard D. Burden's society, past and future. This amount reflects a 80% reduction of the

original recovery required by the reasons stated above.

IT IS ORDERED, ADJUDGED AND DECREED that plaintiffs recover their costs from the defendant. A Bill of Costs shall be filed and verification made thereof in compliance with 28 United States Code §§ 1920, 1924.

There is no just reason for delay, and this is a final and appealable order.